1  DON SPRINGMEYER, ESQ. (#1021)
   d.springmeyer@kempjones.com
2  NATHANAEL R. RULIS, ESQ. (#11259)
   n.rulis@kempjones.com
3  CHAD R. ARONSON, ESQ. (#14471)
   c.aronson@kempjones.com
4  KEMP JONES, LLP
   3800 Howard Hughes Parkway, 17th Floor
5  Las Vegas, Nevada 89169
   Telephone: (702) 385-6000
6  Facsimile:  (702) 385-6001

7  CLARISSE YOUNG SHUMAKER (pro hac vice)
   youngshumaker@smcounsel.com
8  LISA HIRAIDE (pro hac vice)
   hiraide@smcounsel.com
9  BRETT J. WASSERMAN (pro hac vice)
   wasserman@smcounsel.com
10 SHUMAKER MALLORY LLP
   333 S. Grand Avenue, Suite 3400
11 Los Angeles, California 90071
   **Mailing Address:**
12 1 Ringbit Road West
   Rolling Hills, California 90274
13 Telephone: (213) 793-2020
   Facsimile: (213) 674-4268
14
   *COUNSEL FOR PLAINTIFFS*

15

**UNITED STATES DISTRICT COURT**

16

**DISTRICT OF NEVADA**

17

| | |
|---|---|
| 18 ROCKETFUEL BLOCKCHAIN, INC., a Nevada corporation; and ROCKETFUEL 19 BLOCKCHAIN COMPANY, a Nevada Corporation, | Case No.: 2:21-cv-00103-KJD-EJY |
| 20     Plaintiffs, | **PLAINTIFFS' (PROPOSED) FIRST AMENDED COMPLAINT FOR:** |

21  vs.

22  JOSEPH PAGE, an individual; AND
    DOES 1 THROUGH 10, INCLUSIVE,
23
24      Defendant.

**PLAINTIFFS' (PROPOSED) FIRST AMENDED COMPLAINT FOR:**

1. **Violation of Section 10(b) of the *Securities Exchange Act Rule* 10b-5**
2. **Violations of Cal. Corp. Code §§ 24501 and 25501 or, alternatively, Nev. Rev. Stat. §§ 90.570 and 90.660**
3. **Fraud**
4. **Breach of Fiduciary Duty**
5. **Negligent Misrepresentation**
6. **Breach of Contract**
7. **Breach of the Implied Covenant of Good Faith and Fair Dealing**
8. **Unjust Enrichment**
9. **Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, or, alternatively, Nev.**

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

JOSEPH PAGE, an individual,

    Counterclaimant,

vs.

ROCKETFUEL BLOCKCHAIN, INC., a Nevada corporation; and ROCKETFUEL BLOCKCHAIN COMPANY, a Nevada Corporation, *et al.*,

    Counterdefendants.

Rev. Stat. §§ 589.0903, *et seq.*
10. **Injunctive Relief under Cal. Civ. Code § 3439.07, or, alternatively, Nev. Rev. Stat. § 112.210**
11. **Declaratory Judgment and Injunctive Relief under *Federal Rules of Civil Procedure* Rule 57**

**DEMAND FOR JURY TRIAL**

Plaintiffs ROCKETFUEL BLOCKCHAIN, INC. and ROCKETFUEL BLOCKCHAIN COMPANY (collectively, "Plaintiffs") allege as follows:

## PARTIES

1.    Plaintiff ROCKETFUEL BLOCKCHAIN, INC. ("Parent") is a corporation organized and existing under the laws of the state of Nevada. Parent is a publicly traded company formed in 1987 in Nevada, formerly known as B4MC Gold Mines, Inc. ("B4MC"). On June 27, 2018, B4MC acquired Plaintiff RocketFuel Blockchain Company in a reverse acquisition[1], after which B4MC changed its name to RocketFuel Blockchain, Inc.[2]

2.    Plaintiff ROCKETFUEL BLOCKCHAIN COMPANY ("Subsidiary") was formed on January 12, 2018 in Nevada. At all times mentioned herein, Subsidiary was a private operating company. Prior to Parent's acquisition of Subsidiary, Subsidiary's shareholders included Defendant Joseph Page (300 Shares), Gert Funk ("Funk") (300 Shares), Henrik Rouf ("Rouf") by and through his company Pacific Wave Partners Limited ("PWP") (150 Shares), and Richway Finance Ltd. (150 Shares). Prior to Subsidiary being acquired by B4MC (now Parent), an additional 100 Shares were sold to Saxton Capital Ltd. ("Saxton"). After Subsidiary was

---

[1]  A reverse acquisition occurs when a public company acquires an existing private company and the shareholders of the private company receive a controlling block of the parent's stock.

[2]  RBC Parent will be referred to herein as B4MC when referring to pre-closing events.

acquired by B4MC (now Parent) in the reverse acquisition, Subsidiary became a wholly owned subsidiary of Parent.

3. Defendant JOSEPH PAGE ("Page" or "Defendant") was a co-founder of Subsidiary. At all times alleged herein Page served as an officer (Treasurer) of Subsidiary along with Funk and Rouf. At all times relevant herein Page was a resident of La Jolla, California. Plaintiffs are informed and believe and thereon allege that Page currently resides in Valbonne, France.

4. Plaintiffs do not presently know the true names and capacities of the defendants sued herein as Does 1 through 10, inclusive. Plaintiffs will seek leave of court to amend this complaint to allege said defendants' true names and capacities as soon as plaintiff ascertains them. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by those defendants. Each reference in this complaint to "Defendant," "Defendants," or a specifically named Defendant refers also to DOES 1 through 10.

5. Plaintiffs are informed and believe and thereon allege that each of the Defendants is now, and has been at all times herein mentioned, the agent, servant, employee, partner, associate, joint venture, co-participant, and/or principal of or with each of the remaining Defendants, including the DOE Defendants, and that each Defendant has been, at all times herein mentioned acting within the scope of such relationship and with the full knowledge, consent, authority, ratification, and/or permission of each of the remaining Defendants.

## JURISDICTION AND VENUE

6. The claims alleged herein arise under the *Securities Exchange Act Rule* 10b-5 (17 C.F.R. § 240.10b-5). This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and § 27 of the *Securities Exchange Act of 1934*.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims occurred in this district, and

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

the agreement alleged herein was executed through electronic means by Parties located in Los Angeles, La Jolla, California and Las Vegas.

### FACTS COMMON TO ALL CAUSES OF ACTION

*Corporate History*

8.      Plaintiff Subsidiary was co-founded by Defendant and Funk for developing and bringing a highly efficient, automated and secure check-out system to e-commerce based on blockchain technology.  Prior to Subsidiary's formation, Defendant developed the prototype for the check-out system and between 2013 and 2017 filed with the U.S. Patent and Trademark Office ("PTO") five patent applications ("Patent Applications") and two trademark applications ("Trademarks") as follows:

| No.[3] | U.S. Patent Application Number and Description | Filing Date |
|---|---|---|
| I | Patent Application 14/078,202 - "Commerce Systems Having Automated Delivery Feature" | 12 Nov 2013 |
| II | Patent Application 14/324,134 - "Commerce Systems Having Integrated Electronic Delivery Features" | 04 Jul 2014 |
| III | Patent Application 14/244,058 - "Commerce Systems Having Integrated Delivery Feature" | 04 Apr 2014 |
| IV | Patent Application – 14/970,404 - "Cryptocurrency Commerce User Interface Systems" | 15 Dec 2015 |
| V | Patent Application – 14/616,683 - "Cryptocurrency Commerce User Interface Systems" | 07 Feb 2015 |

| No. | U.S. Trademark and Number | Registration Date |
|---|---|---|
| I | **Hit It** – 5,034,747 | 06 Sept 2016 |
| II | **Hit It** (wordmark) - 5,030,179 | 30 Aug 2016 |

---

[3]  For ease of reference, the Patent Applications will be referred to herein by the corresponding Roman numeral.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

Defendant Page filed non-publication requests with the Unites Stated Patent and Trademark Office, which means that the Patent Applications were not published and not made available to the public. Thus, all of the confidential information contained therein would remain confidential and not be available to the public.

9. <u>Assignment of Intellectual Property</u>. In March 2018, Defendant Page executed an assignment of the aforementioned inventions, which included and/or were embodied in the five Patent Applications (hereinafter "IP Portfolio"), to Subsidiary, and did so in exchange for the issuance of 300 shares of Subsidiary common stock.

***The Reverse Acquisition***

10. <u>Subsidiary's Reverse Acquisition with B4MC Gold Mines, Inc. (now Parent)</u>. In June 2018, Subsidiary's management contemplated a reverse acquisition transaction with B4MC, a publicly traded company, by which B4MC acquired 100% of Subsidiary's outstanding and issued shares and Subsidiary's shareholders received newly issued B4MC shares constituting 75% of the total post-acquisition outstanding shares of B4MC.

11. During discussions between Defendant and B4MC leading up to the reverse acquisition, Defendant told Bennett Yankowitz ("Yankowitz"),[4] B4MC's sole director and President at the time, and Rouf that the Patent Applications ***were pending and in the process of being examined*** by the PTO. Defendant also represented that he filed assignments of the Patent Applications and Trademarks in favor of Subsidiary with the PTO.

***The Contribution Agreement***

12. In reliance on these representations, B4MC entered into a "Contribution Agreement" with Subsidiary and its shareholders, including Defendant, Funk, PWP, PWP UK Ltd. (as successor in interest to Richway Financial Ltd.), and Saxton (Subsidiary's shareholders are hereafter collectively referred to as "Sellers") on June 27, 2018. A copy of the Contribution Agreement is attached hereto as Exhibit A and incorporated herein by reference.

---

[4] Bennett Yankowitz is a member of the California Bar (SBN 96802) and an attorney with Shumaker Mallory, LLP, California counsel for Plaintiffs.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

13.     Under the Contribution Agreement, the Sellers sold 100% of their Subsidiary shares in exchange for shares of B4MC's common stock representing 75% of B4MC's outstanding shares post-closing.  Thus, at closing on June 27, 2018, Defendant received 5,100,394 shares of B4MC, which constituted 22.5% of B4MC's (now Parent's) total outstanding shares, valued at over $45,000,000.00.[5]

14.     In addition, under the Contribution Agreement, Subsidiary represented and warranted with regard to the sufficiency of its assets that:

> "The assets (including contractual rights) of [Subsidiary] [including the IP Portfolio] constitute all of the assets, rights and properties that are used in the operation of the businesses of [Subsidiary] as it is now conducted and presently proposed to be conducted or that are used or held by [Subsidiary] for use in the operation of the businesses of [Subsidiary], and taken together, *are adequate and sufficient for the operation of the businesses of [Subsidiary] as currently conducted and as presently proposed to be conducted*." Contribution Agreement § 4.12 (emphasis added).

15.     Page, as a "Seller" under the Contribution Agreement, further represented and warranted that he possessed the authority to execute and deliver "each Ancillary Document"[6] to which he was a party.  Section 5,1 provides:

> "Each of the Sellers has the requisite power and authority to enter into this Agreement and to carry out such Seller's obligations hereunder. *The execution and delivery of this Agreement and each Ancillary* **Document** to which it is a party and the consummation of the transactions contemplated hereby and thereby *(a) have been duly and validly authorized by each Seller, and (b) no other joint venture proceedings,* other than as set forth elsewhere in the Agreement, on the part of such Seller *are necessary to authorize the execution and delivery of this Agreement and each Ancillary Document to which it is a party or to consummate the transactions contemplated hereby and thereby*. This Agreement has been, and each Ancillary Document to which such Seller is a party shall be when delivered, duly and validly executed and delivered by such Seller and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties

---

[5]  At the time of the closing, the closing market price of the shares quoted on the OTC Pink sheets was $9.00 per share.

[6]  The Contribution Agreement defines "Ancillary Documents" as "each agreement, instrument or document attached hereto as an Exhibit, and the other agreements, certificates and instruments to be executed or delivered by any of the Parties hereto in connection with or pursuant to this Agreement." *See* Contribution Agreement § 12.1.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

hereto and thereto, constitutes . . . the valid and binding obligation of such Seller . . ." *See* Contribution Agreement § 5.1 (emphasis added).

16.     Further, Subsidiary represented it would make "commercially reasonable efforts" to "consummate the transactions contemplated by [the Contribution] Agreement," which necessarily encompass a promises regarding the prosecution, preservation, and/or advancement of all rights pertaining to the IP Portfolio.  This provision of the Contribution Agreement states:

> "The Parties hereto shall further cooperate with each other *and use their respective commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable* on their part under this Agreement and applicable Laws *to consummate the transactions contemplated by this Agreement* as soon as reasonably practicable*, including preparing and filing as soon as practicable all documentation to effect all necessary notices, reports and other filings*. Contribution Agreement § 6.5 (emphasis added).

17.     B4MC Name Change.  Post-closing, B4MC changed its name to its current name, *RocketFuel Blockchain, Inc.* (herein Parent)*.  Parent's Board of Directors was reconstituted to be comprised of Defendant, Funk, and Yankowitz.   Defendant was appointed Parent's Chief Technology Officer ("CTO"), Funk was appointed Parent's Chief Executive Officer (CEO) and Yankowitz was reappointed Parent's Chief Financial Officer (CFO) and Secretary.

***Defendant's Demand Leads to Discovery of Defendant's Fraud***

18.     Defendant's Demands and Resignation.  On or about May 15, 2019, Defendant made a demand to Carsten Jensen ("Jensen"), the president of Saxton (one of Parent's largest shareholders), threatening to resign as a director and CTO of Parent unless three demands were met: 1) Parent paid Defendant €100,000 immediately; 2) Parent raised €4,000,000 within 90 days - out of which Defendant was to be paid €350,000; and 3) in the event that €4,000,000 was not raised within 90 days, Parent would transfer the IP Portfolio to Defendant, and only then would Defendant return the 22.5% of Parent shares back to Parent.  Defendant claimed that he was disappointed that Parent had not yet raised capital to develop the technology contained in the IP Portfolio.  Jensen forwarded Defendant's email to Funk.  Parent rejected Defendant's demands, and Defendant resigned from Parent's Board on May 29, 2019.  Despite requests by Parent, Defendant did not resign as Parent's CTO or as the Treasurer of Subsidiary.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

19.   On May 24, 2019, prior to Defendant's resignation from Parent's Board, Yankowitz, on behalf of Parent, wrote to Defendant reminding him that he was still an officer and significant shareholder of Parent and an officer of Subsidiary, and thus he owed fiduciary obligations to Subsidiary, Parent, and Parent's shareholders, including a duty of loyalty. Yankowitz requested that Defendant: (1) transfer back to Parent all company property, including source code and other property and systems Defendant may have developed in his capacity as Parent CTO relating to Parent's intellectual property, including, but not limited to, the IP Portfolio owned through Subsidiary; and (2) provide all communications and correspondence with respect to the Patent Applications between Defendant and any other officer, director, shareholder or employee of Subsidiary or Parent.

20.   <u>Defendant Admits Patent Applications Abandoned</u>.   On or about June 3, 2019, during the course of a conversation with Yankowitz, Defendant admitted ***for the first time*** that the Patent Applications had been abandoned (contradicting his earlier representations) – but conveniently failed to provide the dates the applications were abandoned.   This prompted Yankowitz to immediately dispatch a letter to Defendant on June 3, 2019, requesting that Defendant provide the exact date each Patent Application was abandoned, the files for each Patent Application, the Image File Wrappers (IFW) [7] and all of Defendant's communications with the PTO.   Yankowitz further advised Defendant that because Subsidiary, not Defendant, was the owner of the Patent Applications, Defendant should not attempt to revive the Applications with the PTO or file any new patent application that included, incorporated or referenced the subject matter of the abandoned Patent Applications.

21.   In an apparent attempt to cover up his prior admission by further misrepresenting the truth, Defendant responded to Yankowitz the following day stating that the reason the Patent Applications were abandoned was because Parent had failed to raise capital:

> "I believe [the abandoned patent applications] are now and forever lost
> to intentional abandonment via extended non prosecution as a result of

---

[7]   According to the uspto.gov, the IFW system "uses technology to replace the paper processing of patent applications in the Office. Paper components of these application files (including the specification, oath or declaration, drawings, information disclosure statements, amendments, Office actions, and file jacket notations) have been scanned to create electronic image files."

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

[Parent] failing to capitalize and meet its legal duty to prosecute the applications. I reject the notion that I should not file any new patent applications referring to the subject matter of the abandon[ed] patent applications."

22.    Defendant refused to cooperate by simply providing the requested information and files, and would not agree to refrain from filing any new patent applications that included the subject matter of the abandoned Patent Applications.

23.    <u>More Lies of Defendant Uncovered by Outside IP Counsel</u>.  Outside IP counsel, Mark Kendrick ("Kendrick"), retained by Parent as patent counsel to replace Defendant (who is a registered patent agent) and review and investigate the abandoned Patent Applications[8], uncovered the following information:

a.    Three of the five Patent Applications had been abandoned because of Defendant's failure to respond to a PTO action *years before* Defendant had assigned them to Subsidiary:

i.    <u>Patent Application I</u>: Abandoned **8/7/2014** because Defendant failed to pay an extra filing fee for additional claims.

ii.    <u>Patent Application III</u>: Abandoned **5/11/2017** because Defendant failed to respond to a restriction requirement.

iii.    <u>Patent Application IV</u>: Abandoned **9/8/2016** because Defendant failed to pay the filing fee and describe the drawings properly in the specification.

b.    The Assignments for the other two Patent Applications II and V were defective.  As a result, Kendrick was unable to obtain power of attorney over Patent Applications II and V in order to review the same.  Kendrick eventually learned that Patent Applications II and V had also been abandoned by Defendant before being assigned to Subsidiary.

c.    In or around October 2014, Defendant had attempted unsuccessfully to revive Patent Application I by filing a petition with the PTO; however, on June 30, 2015, the PTO

---

[8]  Kendrick became patent attorney of record of the Patent Applications in the United States Patent and Trademark Office, replacing Defendant as patent agent.

First Amended Complaint

dismissed the petition. Because the petition had been dismissed, it would be extremely difficult for Parent to ever successfully revive Patent Application I.

        d.      Because Subsidiary did not own the Patent Applications at the time they were abandoned and because of the extended length of time that had passed since abandonment, it was unlikely that Parent would be able to successfully revive the Patent Applications from the Patent Applications' abandoned status, requiring Parent to file new applications and take the risk that others, including Defendant, may have already filed competing applications; and

        e.      Because Defendant's practice was to file all of his Patent Applications with a non-publication request, these Patent Applications are not published and are not searchable on the U.S. Patent and Trademark Office website. Thus, there was no way for Parent to know whether there have been intervening filings by Defendant that Defendant assigned to competing claimants.

24.      At no time pre-closing did Defendant disclose the above-mentioned material information about the Patent Applications to Parent/Subsidiary, Yankowitz, Funk or Rouf until Defendant was confronted by Yankowitz on June 3, 2019.

25.      On July 10, 2019, Kendrick wrote to Defendant to, among other things, confront him with his misrepresentations and omissions concerning the Patent Applications and his attempt to mislead Yankowitz into believing that the Patent Applications were abandoned as a result of Parent's failure to raise money to prosecute them. Kendrick also asked Defendant to: (i) provide a list of any idea, invention and/or technology he developed while an officer of Subsidiary; (ii) verify he had not filed any new patent applications that included any portion of the Patent Applications or referred to and/or incorporated by reference any of the disclosures therein in any document; and (iii) had no plans to file any new patent applications that were directed to the same or similar subject matter as the Patent Applications.

26.      Defendant denied that he failed to tell B4MC (now Parent) that the Patent Applications were abandoned and insisted that *both* Yankowitz and Rouf were somehow "confused…with the terminology related to [the] patents" as "the full and true nature of the applications was fully disclosed repeatedly." Defendant had no explanation – beside a blanket

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

denial - why he then tried to deceive Yankowitz to believe that the Patent Applications were abandoned because Parent failed to raise capital with which to prosecute them. Defendant also failed to comply with Kendrick's requests concerning the Patent Applications set forth in paragraph 22 above.

27. Plaintiffs now seek to recover from Defendant all damages that Plaintiffs have incurred as a result of Defendant's fraud and omissions and further seeks recovery of all stock in Parent issued to Defendant.

## FIRST CLAIM FOR RELIEF

**(Violations of Section 10(b) of the *Securities Exchange Act*, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), by Parent against Defendant and Does 1-10)**

28. Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 27 above as if fully set forth herein.

29. Between 2013 and 2017, Defendant Page developed the IP Portfolio, including the prototype for the check-out system and the Patent Applications.

30. Defendant Page made certain representations as to the validity and viability of the IP Portfolio before contributing the Patent Applications, among other intellectual property assets, to Subsidiary in consideration for the issuance of Subsidiary stock to Page in March of 2018.

31. Defendant Page knew and intentionally failed to disclose to Subsidiary the following material facts:

    a. The Patent Applications were abandoned and no longer pending *before* Page assigned them to Subsidiary;

    b. That because the Patent Applications were already abandoned when Defendant assigned them to Subsidiary, Subsidiary would be unable to successfully revive the Patent Applications;

    c. In or about 2015, Page unsuccessfully attempted to revive the application for Patent I, but that petition was dismissed by the PTO on June 30, 2015. As a result, it will be nearly impossible for Parent to revive the application for Patent I.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

32. Defendant Page made the misrepresentations and omissions directly in connection with the issuance of Subsidiary stock in consideration for Page's contribution of the IP Portfolio to Subsidiary.

33. In addition, Defendant Page, as an Officer of Subsidiary, further intentionally failed to disclose to B4MC (now Parent) the following known material facts before the reverse Acquisition transaction occurred, including:

    a.    A number of the Patent Applications had been abandoned years prior;

    b.    The Patent Applications were abandoned and no longer pending *before* Page assigned them to Subsidiary;

    c.    That because the Patent Applications were already abandoned when Defendant assigned them to Subsidiary, Subsidiary would be unable to successfully revive the Patent Applications;

    d.    In or about 2015, Page unsuccessfully attempted to revive the application for Patent I, but that petition was dismissed by the PTO on June 30, 2015. As a result, it will be nearly impossible for Parent to revive the application for Patent I.

    e.    That Subsidiary's stock was in fact worth substantially less than the agreed upon valuation because the underlying assets, including the Patent Applications, which were the basis for Subsidiary's valuation were materially different than Page represented, a fact which was also concealed from Subsidiary's other shareholders and directors by Page.

34. Moreover, during pre-closing discussions leading up to the reverse acquisition between B4MC (now Parent) and Subsidiary, Defendant Page, as an Officer of Subsidiary and in his individual capacity as a shareholder, made certain oral and written misrepresentations, specifically including the written misrepresentations concerning the IP Portfolio in the Contribution Agreement and the oral misrepresentations to Yankowitz and Rouf that the Patent Applications *were pending and in the process of being examined*. Defendant Page solely knew said misrepresentations were patently false when he made them because he never disclosed to

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

Subsidiary that he was aware that the Patent Applications had been *underlined abandoned* by his failure to act considerably *before* he had assigned the Patent Applications to Subsidiary.

35.    Defendant Page made the material misrepresentations and omissions directly in connection with the sale/exchange of Subsidiary stock for B4MC (now Parent) stock in June of 2018.

36.    Defendant knew that the above-referenced statements and omissions were false and/or misleading or acted with reckless disregard as to constitute willful deceit and fraud upon Subsidiary and/or B4MC (now Parent).  Defendant had actual knowledge of the true facts and knowingly and/or deliberately misrepresented, mislead, withheld and/or concealed such material information from Subsidiary and/or B4MC (now Parent), including but not limited to the fact that: (i) Defendant was the inventor, filer, and agent of record of the Patent Applications; (ii) Defendant would have received all communications and deficiency and other notices about the Patent Applications from the PTO, and thus would have received actual notice that the Patent Applications had, in fact, been abandoned, as much as one year before he had assigned them to Subsidiary; and (iii) Defendant's failed petition to revive Patent Application I.

37.    At the time of Defendant's misrepresentations, Subsidiary and/or B4MC (now Parent) were ignorant of their falsity, and believed them to be true.  Subsidiary and/or B4MC (now Parent) were also ignorant of the omitted facts.  The misrepresentations and omissions were material in that: (i) had Subsidiary known that the misrepresentations were false and/or known of the omissions, Subsidiary would have not issued shares of Subsidiary to Page in consideration for the IP Portfolio; and (ii) had B4MC (now Parent) known that the misrepresentations were false and/or known of the omissions, B4MC (now Parent) would not have undertaken the Acquisition by which it purchased Defendant's and the other Subsidiary shareholders' stock and sold its securities to Defendant and the other Subsidiary shareholders as the Patent Applications comprised the majority of Subsidiary's assets.

38.    Defendant Page made use of the means or instrumentalities of interstate commerce, or of the mails, in making the untrue statements of material fact to B4MC (now Parent) and/or Subsidiary, or in omitting to state material facts necessary in order to make statements

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

made to B4MC (now Parent) and/or Subsidiary, in light of the circumstances under which they were made, not misleading.

39.     By reason of the foregoing, Defendant violated Section 10(b) of the *Securities and Exchange Act*, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5.

40.     As a direct and proximate result of Defendant's violations, Parent, directly and by and through Subsidiary, has suffered money damages at least in excess of $5.1 million, the exact amount of which it will prove at trial.

41.     As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same back to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

## SECOND CLAIM FOR RELIEF

**(Violations of Cal. Corp. Code §§ 24501 and 25501 or, alternatively, Nev. Rev. Stat. §§ 90.570 and 90.660 by Defendant and Does 1-10)**

42.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 41 above as if fully set forth herein.

43.     In connection with the offer to issue shares of Subsidiary in consideration for contribution of the IP Portfolio to Subsidiary, Defendant intentionally made oral and/or written communications to Subsidiary, which included untrue statements of material fact or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including but not limited to, statements concerning the viability and validity of the Patent Applications.

44.     In addition, in connection with the offer to sell and the actual sale of all Defendant's issued and outstanding shares of Subsidiary to B4MC (now Parent), Defendant, as an Officer of Subsidiary, and in his individual capacity as a shareholder of Subsidiary, intentionally made oral and/or written communications to B4MC (now Parent) as previously

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

described above, which included untrue statements of material fact or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Such misrepresentations include, but are not limited to, written misrepresentations in the Contribution Agreement, and oral misrepresentations to Yankowitz and Rouf, concerning the pending status of the Patent Applications.

45. Subsidiary did not know the truth regarding the misrepresentations and/or omissions of Defendant, and relied upon the same in agreeing to issue stock to Defendant Page in consideration for the IP Portfolio. Had Subsidiary known that the misrepresentations were false and of the omissions, Subsidiary would not have issued stock to Defendant Page in consideration for the IP Portfolio.

46. B4MC (now Parent) did not know the truth regarding the misrepresentations and/or omissions of Defendant, and relied upon the same in agreeing to the Acquisition by which it purchased Defendant's and the other Subsidiary shareholders' stock and sold its stock to Defendant and the other Subsidiary shareholders. Had B4MC (now Parent) known that the misrepresentations were false and/or of the omissions, B4MC (now Parent) would not have undertaken the Acquisition.

47. Defendant knew that the above-mentioned misrepresentations and omissions to Subsidiary and/or B4MC (now Parent) were false, misleading or Defendant acted with such reckless disregard as to constitute willful deceit and fraud upon B4MC (now Parent). Defendant had actual knowledge of the true facts and knowingly and/or deliberately misrepresented, mislead, withheld and/or concealed material information from Subsidiary and/or B4MC (now Parent), including but not limited to the fact that: (i) Defendant was the inventor, filer, and agent of record of the Patent Applications; (ii) Defendant would have received all communications and deficiency and other notices about the Patent Applications from the PTO, and thus would have received actual notice or communications that the Patent Applications had, in fact, been abandoned as much as one year before he had assigned them to Subsidiary; and (iii) Defendant's failed petition to revive Patent Application I.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

48.     By reason of the foregoing, Defendant violated Defendant violated Cal. Corp. Code § 25401 or, alternatively, NRS § 90.570.

49.     The material misrepresentations and omissions proximately injured Parent, directly and by and through Subsidiary, in excess of $5.1 million, the exact amount of which will be proven at trial.

50.     As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

## THIRD CLAIM FOR RELIEF
### (Fraud by Defendant and Does 1-10)

51.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 50 above as if fully set forth herein.

52.     As alleged above, Defendant made the aforementioned misrepresentations and misleading omissions of material facts to Subsidiary, knowing the misrepresentations were false and the omissions were made with the intent to deceive Subsidiary, or acting with reckless indifference to the truth or falsity of the representations, with the intention and knowledge that they would be relied on by Subsidiary in its decision to issue shares of Subsidiary to Defendant Page in consideration for the Page's contribution of the IP Portfolio to Subsidiary.

53.     As alleged above, prior to the Acquisition, Defendant, as an Officer of Subsidiary and in his individual capacity as a shareholder of Subsidiary, made the aforementioned misrepresentations and misleading omissions of material facts to B4MC (now Parent), knowing the misrepresentations and omissions were false and with the intent to deceive B4MC (now Parent), or acting with reckless indifference to the truth or falsity of the representations, with the intention and knowledge that they would be relied on by B4MC (now Parent) in its decision to

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

1    participate in the Acquisition by purchasing Subsidiary's outstanding and issued stock and selling

2    a majority of B4MC's (now Parent's) outstanding and issued stock to Subsidiary.

3       54. Subsidiary did not know the truth regarding the misrepresentations and/or

4    omissions of Defendant, and relied upon the same in agreeing to issue stock to Defendant Page

5    in consideration for the IP Portfolio.  Had Subsidiary known that the misrepresentations were

6    false and of the material facts that were not disclosed, Subsidiary would not have issued stock to

7    Defendant Page in consideration for the IP Portfolio.

8       55. B4MC (now Parent) did not know the truth regarding the misrepresentations

9    and/or omissions of Defendant, and relied upon the same in agreeing to the Acquisition by which

10   it purchased Defendant's and the other Subsidiary shareholders' stock and sold its stock to

11   Defendant and the other Subsidiary shareholders.  Had B4MC (now Parent) known that the

12   misrepresentations were false and/or of the omissions, B4MC (now Parent) would not have

13   undertaken the Acquisition.

14      56. Defendant knew that the above-mentioned misrepresentations and omissions to

15   Subsidiary and/or B4MC (now Parent) were false, misleading or Defendant acted with such

16   reckless disregard as to constitute willful deceit and fraud upon Subsidiary and/or B4MC (now

17   Parent).  Defendant had actual knowledge of the true facts, both as an individual and as an Officer

18   of Subsidiary, and knowingly and/or deliberately misrepresented, mislead, withheld and/or

19   concealed material information from Subsidiary and/or B4MC (now Parent), including but not

20   limited to the fact that: (i) Defendant was the inventor, filer, and agent of record of the Patent

21   Applications; (ii) Defendant would have received all communications and deficiencies and other

22   notices about the Patent Applications from the PTO, and thus would have received actual notices

23   of communications that the Patent Applications had, in fact, been abandoned as much as one year

24   before he had assigned them to Subsidiary; and (iii) Defendant's failed petition to revive Patent

25   Application I.

26      57. Defendant made the misrepresentations and materially misleading omissions, and

27   conducted such concealment of the truth concerning the omissions, to Subsidiary with the

28

First Amended Complaint

intention of inducing Subsidiary to rely thereon by issuing shares of Subsidiary to Page in consideration for the contribution of the IP Portfolio to Subsidiary.

58.     Subsidiary, not knowing of the truth concerning the aforesaid misrepresentations and materially misleading omissions, relied thereon by issuing Subsidiary stock to Defendant Page in consideration for the contribution of the IP Portfolio to Subsidiary.

59.     Defendant made the misrepresentations and materially misleading omissions, and conducted such concealment of the truth concerning the omissions, to B4MC (now Parent), as an Officer of Subsidiary and in his individual capacity as a shareholder, with the intention of inducing B4MC (now Parent) into participating in the Acquisition with Subsidiary.  Defendant intended all along to bait B4MC (now Parent) into the transaction by dangling the promise of potentially profitable patents which covered state-of-the art e-commerce check-out IP, which in reality were abandoned, in order to acquire 5,100,394 shares constituting 22.5% of Parent's outstanding shares to the detriment of Parent.

60.     B4MC (now Parent), not knowing of the truth concerning the aforesaid misrepresentations and materially misleading omissions, relied thereon by participating in the Acquisition and exchanging Subsidiary's outstanding and issued stock for a majority of B4MC's (now Parent's) outstanding and issued stock.

61.     Such reliance by Subsidiary and/or B4MC (now Parent) on such misrepresentations and materially misleading omissions was reasonable especially in view of Defendant's: (i) legal duties under the federal and California and/or Nevada securities laws; (ii) position as an Officer of Subsidiary; and (iii) position as IP agent of record on the Patent Applications.

62.     As a direct and proximate result of Subsidiary's and B4MC's (now Parent's) respective reliance on such misrepresentations and materially misleading omissions of Defendant Page, B4MC (now Parent) directly and by and through Subsidiary, has been damaged in an amount subject to proof at trial.

63.     The aforementioned conduct of Defendant consists of intentional misrepresentations, deceit, and concealment of material facts known solely to him, with the

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

intention on the part of said Defendant to deprive Subsidiary and/or B4MC (now Parent) of property or legal rights or otherwise cause injury to it. Such actions were done to induce Subsidiary to issue shares to Page and to induce B4MC (now Parent) to exchange a majority of its outstanding shares of common stock in exchange for Defendant's and the other Subsidiary shareholders' shares in Subsidiary.

64.     Accordingly, the actions of Defendant, individually and collectively against Subsidiary and B4MC (now Parent), were oppressive, fraudulent and malicious and justifies awarding exemplary and punitive damages to Parent, sufficient to make an example of and punish Defendant, in an amount to be proven at trial.

65.     As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

## FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty by Defendant and DOES 1-10)

66.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 65 above as if fully set forth herein.

67.     At all times relevant herein, Defendant served as an Officer (Treasurer) of Subsidiary. At all times relevant herein, Defendant also served as an Officer (Chief Technology Officer) and Director of Parent post-closing of the Acquisition. Thus, while serving in his capacity as an Officer and Director of Subsidiary and Parent, Defendant owed Subsidiary and/or Parent, statutory and common law fiduciary duties, including the duty of loyalty, which required Defendant to act in good faith and in the best interest of Subsidiary and/or Parent and their respective shareholders, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

68.     Defendant breached his respective fiduciary duties to Subsidiary and/or Parent by failing to disclose that the Patent Applications had been abandoned by Defendant before Defendant purportedly assigned those Patent Applications to Subsidiary.  Such failure to disclose prevented Subsidiary from taking steps to revive the Patent Applications pre-closing, caused Subsidiary and B4MC (now Parent) to enter into the Acquisition under false pretenses thereby exposing Subsidiary to claims of fraud, and prevented Parent from reviving and/or refiling the Patent Applications much earlier.

69.     Defendant further breached his fiduciary duties to Parent, including the duty of loyalty, by refusing to simply cooperate with Yankowitz's and Kendrick's requests on behalf of Parent to turn over basic information and files concerning the Patent Applications, including all communications with the PTO and/or shareholders, officers, directors or employees of Subsidiary or Parent.

70.     By engaging in the previously mentioned conduct, Defendant failed to act in good faith and in the best interests of both Subsidiary and/or Parent, failed to act in the face of a known duty to act, and instead, placed his own personal and pecuniary interests above those of Subsidiary and/or Parent.  As such, Defendant breached his respective fiduciary duties, including the duty of loyalty and duty to act in good faith, to Subsidiary and/or Parent.

71.     As a direct and proximate result of Defendant's breach of his respective fiduciary duties to Subsidiary and/or Parent as set forth herein, Parent, directly and by and through Subsidiary, has suffered and will continue to suffer damages in the amount according to proof at the time of trial.

72.     In engaging in the above acts, in violation of his respective fiduciary duties to Subsidiary and/or Parent, Defendant acted in conscious disregard of the rights of Subsidiary and/or Parent therefore justifying an award of exemplary and punitive damages in an amount to be proven at the time of trial.

73.     As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

### FIFTH CLAIM FOR RELIEF

**(Negligent Misrepresentation by Defendant and Does 1-10)**

74.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 73 above as if fully set forth herein.

75.     Defendant, in his dealings with Subsidiary and B4MC (now Parent), had a duty of good faith and fair dealing.  Defendant further had a duty to Subsidiary as an Officer of Subsidiary.

76.     Defendant breached his respective duties to Subsidiary and B4MC (now Parent) by making certain material misrepresentations and omitting certain material facts, as previously described hereinabove, with the intention of: (i) Subsidiary relying on the same in issuing shares of Subsidiary in consideration for the contribution of the IP Portfolio; and (ii) B4MC (now Parent) relying on the same in agreeing to the Acquisition and exchanging shares representing a controlling interest of B4MC (now Parent) for all of the shares of Subsidiary.

77.     In truth and in fact, each of the material misrepresentations and material omissions previously described hereinabove were false.

78.     Defendant failed to exercise due diligence or conduct reasonable inquiry about the truth and accuracy of his representations concerning the Patent Applications or in disclosing all material information concerning the same.

79.     As a direct and proximate result of Defendant's respective misrepresentations and omissions to Subsidiary and B4MC (now Parent), and in actual and reasonable reliance thereon, Subsidiary issued shares to Defendant Page in consideration for the contribution of the IP Portfolio to Subsidiary and B4MC (now Parent) entered into the Contribution Agreement.

80.     As a direct and proximate result of Defendant's respective misrepresentations and omissions to Subsidiary and B4MC (now Parent), Parent directly and by and through Subsidiary,

has suffered and will continue to suffer damages in the amount according to proof at the time of trial.

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract against Defendant and Does 1-10)

81.     Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 80 as if fully set forth herein.

82.     As alleged above, Page initially assigned rights to the IP Portfolio to Subsidiary in exchange for common stock in the same, and then subsequently entered the Contribution Agreement, under which Page (and other shareholders) transferred the IP Portfolio in exchange for common stock in Parent.

83.     In March of 2018, Page, and other shareholders of Subsidiary, executed a valid agreement, the Contribution Agreement, with B4MC (predecessor of Parent), providing for Page and the other shareholders' receipt of B4MC's common stock in exchange for 100% of their shares in Subsidiary.

84.     Parent performed under the Contribution Agreement in all material respects, particularly by transferring to Page shares of B4MC's common stock.

85.     Page, on the other hand, failed to perform under §§ 4.12, 5.1 and 6.5, under which Page promised to provide the IP Portfolio as identified in the Contribution Agreement, prosecute the rights within the IP Portfolio, including and to timely provide and/or return documentation and/or information to Parent upon demand for the same in the event of termination of the Contribution Agreement.

86.     Under § 4.12 of the Contribution Agreement, Page represented Subsidiary's assets, including the IP Portfolio " constitute all of the assets, rights and properties that are used in the operation of the businesses of [Subsidiary] as it is now conducted and presently proposed to be conducted or that are used or held by [Subsidiary] for use in the operation of the businesses of [Subsidiary]." *See* Contribution Agreement § 4.12 (emphasis added).

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

87.     Section 4.12 continues that Subsidiary's assets "taken together, are adequate and sufficient for the operation of the businesses of [Subsidiary] as currently conducted and as presently proposed to be conducted." *See id.*

88.      Additionally, Page represented and warranted he had authority to execute and deliver "each Ancillary Document to which [he] is a party" and promised to undertake "commercially reasonable efforts" to "consummate the transactions contemplated by [the Contribution] Agreement," which necessarily encompasses a promise the prosecution, preservation, and/or advancement of all rights pertaining to the IP Portfolio. *See* Contribution Agreement §§ 5.1, 6.5.

89.     Page, by failing to transfer the IP Portfolio as identified under § 4.12, failed to tender performance and, consequently, breached the Contribution Agreement.

92.     Under §§ 5.1 and 6.5, Page's abandonment of the IP Portfolio and admitted failure to make any effort to revive rights under the same at all relevant times constitutes a failure of performance under the Contribution Agreement.

90.     As a direct and proximate result of Page's breach of contract, Parent directly and by and through Subsidiary, has suffered and will continue to suffer damages in the amount according to proof at trial.

91.     Further, and pursuant to § 11.6 of the Contribution Agreement, Plaintiffs are entitled to specific performance, including through an injunction or restraining order, "to prevent breaches of [the Contribution Agreement] and to seek to enforce specifically the terms and provisions hereof [.]"  As such, Plaintiffs are entitled to a court order compelling Page to perform under the Contribution Agreement by executing a valid assignment of the IP Portfolio, as promised.

### SEVENTH CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing against Defendant and Does 1-10)

92.     Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 91 as if fully set forth herein.

First Amended Complaint

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

93.     As alleged above, Page entered into a contract with Subsidiary to exchange Page's IP Portfolio for shares in Subsidiary, and later executed the Contribution Agreement, under which Page and other shareholders of Subsidiary gained common stock in Parent in exchange for Subsidiary's assets, including the IP Portfolio.

94.     Page breached his duty of good faith required under the Contribution Agreement, under which Page and the other shareholders sold 100% of their shares in Subsidiary in exchange for shares of B4MC's common stock.

95.     As alleged above, the Contribution Agreement contains several provisions that evince the parties' understanding that the IP Portfolio was being advanced before the PTO, Page would continue to prosecute, monitor, and execute all writings with respect to the PTO process, and the parties would cooperate in returning all Confidential Information in the event of the Contribution Agreement's termination.

96.     Page performed its contractual obligations in a manner unfaithful to the purpose of the agreement by failing to provide to Parent valid, viable rights to the IP Portfolio, refusing to disclose the abandoned (and perhaps un-revivable) status of the IP Portfolio, declining to make efforts to advance, prosecute, or monitor the status of the IP Portfolio before the PTO, and by rejecting demands from Parent to immediately turn over all Confidential Information, namely all documentation concerning the IP Portfolio.

97.     Subsidiary was denied its justified expectations that the IP Portfolio:

    a.     Possessed the value and validity as contemplated under the Contribution Agreement;

    b.     Contained Patent Applications that were presently before the PTO;

    c.     Was being actively prosecuted and monitored by Page during the pendency of the PTO process, including by completing any required writings or documentation.

    d.     Would be promptly returned to Parent upon termination of the Contribution Agreement, along with all related documentation constituted "Confidential Information."

98.     As a direct and proximate result of Page's breach of contract, Parent directly and by and through Subsidiary, has suffered and will continue to suffer damages in the amount according to proof at trial.

## **EIGHTH CLAIM FOR RELIEF**

### **(Unjust Enrichment against Defendant and Does 1-10)**

99.     Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 98 as if fully set forth herein.

100.     As a result of the conduct alleged herein, Subsidiary was fraudulently induced to issue shares to Defendant Page in consideration for the contribution of the IP Portfolio to Subsidiary.

101.     As a result of the conduct alleged herein, B4MC (now Parent) was fraudulently induced to enter into the Contribution Agreement and consummate the reverse Acquisition for valuable consideration.

102.     Defendant has been unjustly enriched at the expense of Parent, directly and by and through Subsidiary.

103.     Parent seeks restitution from Defendant and seeks an order of this Court disgorging all profits, benefits, and other consideration obtained by Defendant as a result of Defendant's receipt of Subsidiary stock and the acquisition of Subsidiary by B4MC (now Parent), including, but not limited to, Defendant's Parent stock.

104.     As a proximate result of Defendant's fraudulent misrepresentations and omissions, and the otherwise wrongful manner in which Defendant obtain his alleged right, claim or interest in and to Parent Shares, Defendant has no legal or equitable right, claim or interest therein, but instead Defendant is an involuntary trustee holding said Parent shares in constructive trust for Parent with the duty to convey the same to Parent forthwith under Cal. Civ. Code § 2224 or, alternatively, Nevada common law.

/ / /

/ / /

/ / /

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

## NINTH CLAIM FOR RELIEF

**(Violation Cal. Bus. & Prof. Code §§ 17200, *et seq.*, or, alternatively, Nev. Rev. Stat. §§ 589.0903, *et seq.* against Defendant and Does 1-10)**

105.    Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 104 as if fully set forth herein.

106.    Cal. Bus. & Prof Code §§ 17200 *et seq.*, also known as California's Unfair Competition Law ("UCL"), prohibits any "unlawful, unfair or fraudulent business act or practice."

107.    NRS §§ 589.0903, *et seq.* prohibits persons from engaging in a "deceptive trade practice" during the "course of his or her business or occupation."

108.    Defendant Page at all times herein mentioned was an individual doing business in the County of San Diego, City of La Jolla.

109.    Defendant Page has violated, and continues to violate Cal Bus. & Prof. Code §§ 17200, *et seq.*'s prohibition on "unfair" acts or practices, or, alternatively, NRS §598.0903, *et seq.*'s prohibition on "deceptive trade practices," by:

    a.    Making material misrepresentations and/or omitting material facts concerning the validity and viability of the Patent Applications to Subsidiary prior to contributing the same to Subsidiary in consideration for the issuance of Subsidiary shares;

    b.    Failing to apprise the shareholders, officers, and directors of Subsidiary, as an Officer of Subsidiary, as to the abandonment of the Patent Applications;

    c.    Misrepresenting and/or omitting material facts concerning the status of the Patent Applications to B4MC (now Parent), in his capacity as an Officer of Subsidiary and in his capacity as an individual shareholder, during B4MC's (now Parent's) due diligence prior to the Acquisition;

    d.    Refusing to apprise the shareholders, officers, and directors of Parent, as an Officer and Director of Parent, as to the abandonment of the Patent Applications; and

e.     Failing to simply cooperate and turn over to Parent basic information and files concerning the Patent Applications, including all communications with the PTO and/or shareholders, officers, directors or employees of Subsidiary or Parent, as repeatedly requested by Yankowitz and Kendrick.

110.     Defendant Page has violated, and continues to violate Cal. Bus. & Prof. Code §§ 17200, *et seq.*'s prohibition on "unfair" acts or practices or, alternatively, NRS §§ 598.0903, *et seq.*'s prohibition on "deceptive trade practices," by his failure to relinquish the shares of Parent that Defendant Page obtained through his misrepresentations, omissions, and deceit of Subsidiary and/or B4MC (now Parent).

111.     Parent, directly and by and through Subsidiary, was harmed by "unfair" acts or "deceptive trade practices" in an amount to be proven at trial.

112.     Injunctive Relief preventing Defendant Page from disposing of his Parent stock is appropriate to further prevent said acts and omissions under Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and NRS §§ 598.0903, *et seq.* Parent lacks an adequate remedy at law, as any compensation by Page would be insufficient relative to the value of the Parent stock, and there is a serious risk of irreparable harm absent injunctive relief. Parent is likely to prevail on the merits of the underlying controversy, and a comparison of the harm to defendant in issuing an injunction versus the harm to Plaintiffs in withholding it, favors Parent.

## TENTH CLAIM FOR RELIEF

**(Injunctive Relief under Cal. Civ. Code § 3439.07, or, alternatively, Nev. Rev. Stat. § 112.210 against Defendant and Does 1-10)**

113.     Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 112 as if fully set forth herein.

114.     Injunctive Relief preventing Defendant Page from disposing of his Parent stock is appropriate to prevent the fraudulent transfer of the same under Cal Civ Code § 3439.07 or, alternatively, NRS § 112.210.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

115. Parent lacks an adequate remedy at law, as any compensation by Page would be insufficient relative to the value of the Parent stock, and there is a serious risk of irreparable harm absent injunctive relief.

116. Parent is likely to prevail on the merits of the underlying controversy, and a comparison of the harm to defendant in issuing an injunction versus the harm to Plaintiffs in withholding it, favors Parent.

## ELEVENTH CLAIM FOR RELIEF

**(Declaratory Judgment and Injunctive Relief under *Federal Declaratory Judgments Act*, 28 U.S.C. §§ 2201–2202, and Rule 57 of the *Federal Rules of Civil Procedure* against Defendant and Does 1-10)**

117. Plaintiffs repeat and reallege each and every allegation above in paragraphs 1 through 116 as if fully set forth herein.

118. This action for declaratory judgment is made pursuant to the *Federal Declaratory Judgments Act*, 28 U.S.C. §§ 2201–2202, and Rule 57 of the *Federal Rules of Civil Procedure*.

119. An actual controversy regarding the ownership of the subject matter of the Patent Applications exists between the Parties within the meaning of 28 U.S.C. § 2202, which is of sufficient immediacy and reality to warrant declaratory relief.

120. This action concerns the issue of whether the Plaintiffs are the owners of the subject matter of the Patent Applications and jurisdiction is therefore proper under 28 U.S.C. § 1331.

121. Defendant Page filed the Patent Applications, which contained confidential information. The Patent Applications remained confidential and unavailable to the public due to the non-publication requests filed by Page with the United States Patent and Trademark Office and the subsequent abandonment of the Patent Applications (the subject matter of the Patent Applications has not been published).

122. In or around March of 2018, Defendant Page transferred his ownership interests in the Patent Applications, and all of the underlying subject matter, to Subsidiary in exchange for shares of Subsidiary stock.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

123.    On June 27, 2018, Defendant Page and Subsidiary, along with the other parties involved, executed the Contribution Agreement, which transferred 100% ownership of the stock of Subsidiary to Parent, and as such, all of the ownership interests in the Patent Applications, and the underlying subject matter, held by Subsidiary at the time became the property of Parent.

124.    On or about June 4, 2019, Defendant Page represented to Yankowitz that he owned the underlying subject matter of the Patent Applications and his intent to file new patent applications utilizing the same subject matter when he rejected "the notion that [he] should not file any new patent applications referring to the subject matter of the abandon[ed] patent applications."

125.    As a result of the facts described above in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the Parties regarding Plaintiffs' ownership of the underlying subject matter of the Patent Applications.

126.    Injunctive Relief preventing Defendant Page from filing new patent applications utilizing the same subject matter as the unpublished Patent Applications (and the subject matter contained therein) is appropriate to prevent further perpetuating the fraudulent acts committed by Page against Subsidiary and Parent.

127.    Parent lacks an adequate remedy at law, as any compensation by Page would be insufficient relative to the value of the underlying subject matter of the Patent Applications, and there is a serious risk of irreparable harm absent injunctive relief.

128.    Parent is likely to prevail on the merits of the underlying controversy, and a comparison of the harm to defendant in issuing an injunction versus the harm to Plaintiffs in withholding it, favors Parent.

/ / /

/ / /

/ / /

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for judgment against Defendant as follows:

**On the FIRST (Violations of § 10(b) of the Securities and Exchange Act, etc.) AND SECOND (Violations of Cal. Corp. Code §§ 24501 and 25501 or, alternatively, Nev. Rev. Stat. §§ 90.570 and 90.660) CLAIMS FOR RELIEF:**

1. For an order declaring that Defendant hold in constructive trust for Parent all shares of Parent stock and any and all proceeds, in whatever form, Defendant has received therefrom;

2. For compensatory and consequential damages in an amount to be proven at trial;

3. For restitution of all consideration paid by Subsidiary for the Patent Applications and by B4MC (now Parent) pursuant to the Contribution Agreement;

4. For prejudgment interest at the maximum legal rate;

5. For reasonable attorneys' fees and costs of the suit incurred herein;

6. For such other and further relief as the Court deems just and proper.

**On the THIRD (Fraud) AND FOURTH (Breach of Fiduciary Duty) CLAIMS FOR RELIEF:**

7. For an order declaring that Defendant hold in constructive trust for Parent all shares of Parent stock and any and all proceeds, in whatever form, Defendant has received therefrom;

8. For general and special damages in an amount to be proven at trial;

9. For exemplary and punitive damages in an amount to be proven at trial;

10. For an award of prejudgment interest, costs of the suit, and reasonable attorneys' fees to the extent permitted by law; and

11. For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

12. For such other relief as this Court deems just and proper under the circumstances.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

**On the FIFTH CLAIM FOR RELIEF (Negligent Misrepresentation):**

13.     For an order declaring that Defendant hold in constructive trust for Parent all Company shares of stock and any and all proceeds, in whatever form, Defendant has received therefrom;

14.     For general and special damages in an amount to be proven at trial;

15.     For prejudgment interest at the maximum legal rate;

16.     For reasonable attorneys' fees and costs of the suit incurred herein;

17.     For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

18.     For such other and further relief as the Court deems just and proper.

**On the SIXTH CLAIM FOR RELIEF (Breach of Contract):**

19.     For an order requiring specific performance of the Contribution Agreement, namely Page's assignment of rights to the IP Portfolio to Parent.

20.     For compensatory and consequential damages in an amount to be proven at trial;

21.     For prejudgment interest at the maximum legal rate;

22.     For reasonable attorneys' fees and costs of the suit incurred herein;

23.     For such other and further relief as the Court deems just and proper.

**On the SEVENTH CLAIM FOR RELIEF (Breach of the Implied Covenant of Good Faith and Fair Dealing):**

24.     For compensatory and consequential damages in an amount to be proven at trial;

25.     For prejudgment interest at the maximum legal rate;

26.     For reasonable attorneys' fees and costs of the suit incurred herein;

27.     For such other and further relief as the Court deems just and proper.

**On the EIGHTH CLAIM FOR RELIEF (Unjust Enrichment):**

28.     For an order declaring that Defendant hold in constructive trust for Parent all Company shares of stock and any and all proceeds, in whatever form, Defendant has received therefrom.

First Amended Complaint

29. For restitution of all consideration paid by Subsidiary for the Patent Applications and by B4MC (now Parent) pursuant to the Contribution Agreement;

30. For prejudgment interest at the maximum legal rate;

31. For reasonable attorneys' fees and costs of the suit incurred herein;

32. For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

33. For such other and further relief as the Court deems just and proper.

**On the <u>NINTH CLAIM FOR RELIEF (Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*, or, alternatively, Nev. Rev. Stat. §§ 589.0903, *et seq.*)</u>:**

34. For a preliminary and permanent injunction, enjoining and restraining Defendant, his agents, and all other persons in active concert or privity or in participation with them, from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, granting a lien or security or other interest in, or otherwise disposing of shares of Parent stock, or any interest therein, wherever located, including outside the territorial United States, that Defendant wrongfully acquired from B4MC (now Parent) and requiring Defendant to hold such shares of stock in trust for the benefit of Parent until final judgment in this action;

35. For restitution of all consideration paid by Subsidiary for the Patent Applications and by B4MC (now Parent) pursuant to the Contribution Agreement;

36. For general and special damages in an amount to be proven at trial;

37. For prejudgment interest at the maximum legal rate;

38. For reasonable attorneys' fees and costs of the suit incurred herein;

39. For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

40. For such other and further relief as the Court deems just and proper.

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

**On the <u>TENTH CLAIM FOR RELIEF (Injunctive Relief under Cal Civ. Code §<br>3439.07 or, alternatively, Nev. Rev. Stat. § 112.210</u>):**

41.    For a preliminary and permanent injunction, enjoining and restraining Defendant, his agents, and all other persons in active concert or privity or in participation with them, from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, granting a lien or security or other interest in, or otherwise disposing of shares of Parent stock, or any interest therein, wherever located, including outside the territorial United States, that Defendant wrongfully acquired from B4MC (now Parent) and requiring Defendant to hold such shares of stock in trust for the benefit of Parent until final judgment in this action;

42.    For restitution of all consideration paid by Subsidiary for the Patent Applications and by B4MC (now Parent) pursuant to the Contribution Agreement;

43.    For general and special damages in an amount to be proven at trial;

44.    For prejudgment interest at the maximum legal rate;

45.    For reasonable attorneys' fees and costs of the suit incurred herein;

46.    For an order removing Defendant as officer of Parent and as an officer of Subsidiary;

47.    For such other and further relief as the Court deems just and proper.

**On the <u>ELEVENTH CLAIM FOR RELIEF (Declaratory Judgment and Injunctive<br>Relief under <i>Federal Declaratory Judgments Act</i>, 28 U.S.C. §§ 2201–2202, and Rule 57 of the<br><i>Federal Rules of Civil Procedure</i></u>):**

48.    For a declaration that Parent is the undivided owner of the Patent Applications and the underlying subject matter, including the non-published confidential information.

49.    For a preliminary and permanent injunction, enjoining and restraining Defendant, his agents, and all other persons in active concert or privity or in participation with them, from filing any patent applications with the United States Patent and Trademark Office utilizing the underlying subject matter of the Patent Applications until final judgment in this action;

50.    For reasonable attorneys' fees and costs of the suit incurred herein;

First Amended Complaint

51. For such other and further relief as the Court deems just and proper.

## **DEMAND OF JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a trial by jury on all issues so triable.

DATED this _____ day of February 2021.

Respectfully Submitted,

KEMP JONES, LLP

_____
Don Springmeyer, Esq. (#1021)
Nathanael R. Rulis, Esq. (#11259)
Chad R. Aronson, Esq. (#14471)
3800 Howard Hughes Pkwy., 17th Floor
Las Vegas, NV 89169

SHUMAKER MALLORY LLP
Clarisse Young Shumaker (pro hac vice)
Lisa Hiraide (pro hac vice)
Brett J. Wasserman (pro hac vice)
333 S. Grand Avenue, Suite 3400
Los Angeles, California 90071
Mailing Address:
1 Ringbit Road West
Rolling Hills, California 90274

*Counsel for Plaintiffs*

KEMP JONES, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

# EXHIBIT A

**CONTRIBUTION AGREEMENT**

by and among

**B4MC Gold Mines, Inc.**
as the Purchaser,

**Rocketfuel Blockchain Company**
as the Company,

and

**Gert Funk, Joseph Page, PacificWave Partners Limited, PacificWave Partners UK Ltd. and Saxton Capital Ltd.**

as the Sellers

**Dated as of June 27, 2018**

Execution Version

## CONTRIBUTION AGREEMENT

This Contribution Agreement (this "***Agreement***") is made and entered into as of June 27, 2018 by and among (i) B4MC Gold Mines, Inc., a Nevada corporation (the "***Purchaser***"), (ii) Rocketfuel Blockchain Company, a Nevada corporation (the "***Company***"), and Gert Funk ("***Funk***"), Joseph Page ("***Page***"), PacificWave Partners Limited ("***PWP***"), PacificWave Partners UK Ltd. ("***PWPUK***") and Saxton Capital Ltd ("***Saxton***").  Funk, Page, PWP, PWPUK and Saxton are collectively referred to herein as the "***Sellers***", individually each a "***Seller***"). The Purchaser, Company and the Sellers are sometimes referred to herein individually as a "***Party***" and, collectively, as the "***Parties***".

### RECITALS:

A.      The Sellers are the owners of all of the issued and outstanding shares of common stock of the Company (the "***Company Interests***") and desire to transfer one hundred percent (100%) of such shares of common stock of the Company ("***Contributed Securities***") for shares of Purchaser Common Stock as described herein.

B.      The Purchaser is authorized to issue seven hundred fifty million (750,000,000) shares of its Common Stock, and as of the date hereof, 5,667,104 shares of that Purchaser Common Stock are issued and outstanding. The Purchaser desires to exchange at the Closing, seventeen million one thousand three hundred twelve (17,001,312) Purchaser Common Stock (the "***Contribution Consideration***") representing seventy-five percent (75%) of the total outstanding Purchaser Common Stock, on a fully diluted basis, after the issuance of the Contribution Consideration, for the Contributed Securities.

C.      The Parties intend that the Contribution will qualify as a tax-free "reorganization" within the meaning of Section 351 of the Code (as defined herein).

D.      Certain capitalized terms used herein are defined in Article XII hereof.

**NOW, THEREFORE**, in consideration of the premises set forth above, which are incorporated in this Agreement as if fully set forth below, and the representations, warranties, covenants and agreements contained in this Agreement, and intending to be legally bound hereby, the Parties hereto agree as follows:

### ARTICLE I
### CONTRIBUTION

1.1      Contribution. Effective as of the Closing Date, (i) the Sellers each hereby contribute, transfer, assign and convey to the Purchaser all right, title and interest in and to all of the Contributed Securities, together with any and all rights, privileges, benefits, obligations and liabilities appertaining thereto, reserving unto such Seller no rights or interests therein whatsoever, and (ii) the Purchaser hereby accepts the contribution of the Contributed Securities, and in consideration for such contribution the Sellers collectively shall be entitled to receive from the Purchaser the Contribution Consideration with each Seller receiving for their respective percentage of Contributed Securities that same percentage of the Contribution Consideration (the "***Contribution***").

1.2      Tax Treatment. For federal income tax purposes, the Contribution is intended to constitute a tax-free reorganization within the meaning of Section 351, as mutually agreed to by the Parties.

### ARTICLE II
### CLOSING

2.1     Closing**.** Subject to and conditional upon the satisfaction or waiver of the Closing Conditions the consummation of the transactions contemplated by this Agreement (the "***Closing***") shall take place at the offices of Ellenoff Grossman & Schole, LLP ("***EGS***"), 1345 Avenue of the Americas, New York, NY 10105, on the second (2nd) Business Day after all the Closing conditions to this Agreement have been satisfied or waived at 10:00 a.m. local time, or at such other date, time or place as the Purchaser and the Company may agree (the date and time at which the Closing is actually held being the "***Closing Date***"). The parties need not be physically present at the Closing and may participate telephonically.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Except as set forth in the disclosure schedules delivered by the Purchaser to the Company on the date hereof (the "***Purchaser Disclosure Schedules***"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer the Purchaser represents and warrants to the Company, as of the date hereof and as of the Closing, as follows:

3.1     Organization and Standing**.** The Purchaser is a corporation duly incorporated, validly existing and in good standing under the state of Nevada. The Purchaser has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted. The Purchaser is duly qualified or licensed and in good standing to do business in each jurisdiction in which the character of the property owned, leased or operated by it or the nature of the business conducted by it makes such qualification or licensing necessary. The Purchaser has heretofore made available to the Company accurate and complete copies of the Organizational Documents of the Purchaser, as currently in effect. The Purchaser is not in violation of any provision of its Organizational Documents.

3.2     Authorization; Binding Agreement**.** The Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and each Ancillary Document to which it is a party, to perform the Purchaser's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and each Ancillary Document to which it is a party and the consummation of the transactions contemplated hereby and thereby (a) have been duly and validly authorized by the board of directors of the Purchaser, and (b) no other corporate proceedings, other than as set forth elsewhere in the Agreement, on the part of the Purchaser are necessary to authorize the execution and delivery of this Agreement and each Ancillary Document to which it is a party or to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each Ancillary Document to which the Purchaser is a party shall be when delivered, duly and validly executed and delivered by the Purchaser and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties hereto and thereto, constitutes, or when delivered shall constitute, the valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting the enforcement of creditors' rights generally or by any applicable statute of limitation or by any valid defense of set-off or counterclaim, and the fact that equitable remedies or relief (including the remedy of specific performance) are subject to the discretion of the court from which such relief may be sought (collectively, the "***Enforceability Exceptions***").

3.3     Governmental Approvals**.** No Consent of or with any Governmental Authority, on the part of the Purchaser is required to be obtained or made in connection with the execution, delivery or performance by the Purchaser of this Agreement and each Ancillary Document to which it is a party or the consummation by the Purchaser of the transactions contemplated hereby and thereby, other than (a) such filings as contemplated by this Agreement, (b) any filings required with FINRA or the SEC with respect to the transactions contemplated by this Agreement, (c) applicable requirements, if any, of the Securities Act,

the Exchange Act, and/ or any state "blue sky" securities Laws, and the rules and regulations thereunder, and (d) where the failure to obtain or make such Consents or to make such filings or notifications, would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

3.4 **Non-Contravention.** The execution and delivery by the Purchaser of this Agreement and each Ancillary Document to which it is a party, the consummation by the Purchaser of the transactions contemplated hereby and thereby, and compliance by the Purchaser with any of the provisions hereof and thereof, will not (a) conflict with or violate any provision of the Purchaser's Organizational Documents, (b) subject to obtaining the Consents from Governmental Authorities referred to in Section 3.3 hereof, and the waiting periods referred to therein having expired, and any condition precedent to such Consent or waiver having been satisfied, conflict with or violate any Law, Order or Consent applicable to the Purchaser or any of its properties or assets, or (c) (i) violate, conflict with or result in a breach of, (ii) constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, (iii) result in the termination, withdrawal, suspension, cancellation or modification of, (iv) accelerate the performance required by the Purchaser under, (v) result in a right of termination or acceleration under, (vi) give rise to any obligation to make payments or provide compensation under, (vii) result in the creation of any Lien upon any of the properties or assets of the Purchaser under, (viii) give rise to any obligation to obtain any third party Consent or provide any notice to any Person or (ix) give any Person the right to declare a default, exercise any remedy, claim a rebate, chargeback, penalty or change in delivery schedule, accelerate the maturity or performance, cancel, terminate or modify any right, benefit, obligation or other term under, any of the terms, conditions or provisions of, any Purchaser Material Contract, except for any deviations from any of the foregoing clauses (a), (b) or (c) that would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

3.5 Capitalization

(a) The Purchaser is authorized to issue 750,000,000 shares of Purchaser Common Stock. The issued and outstanding shares of Purchaser Common Stock as of the date of this Agreement are set forth on Schedule 3.5(a). All outstanding Purchaser Common Stock are duly authorized, validly issued, fully paid and non-assessable and not subject to or issued in violation of any purchase option, right of first refusal, preemptive right, subscription right or any similar right under any provision under Chapter 78 of the Nevada Revised Statutes, as then applicable, the Purchaser Charter or any Contract to which the Purchaser is a party. None of the outstanding Purchaser Common Stock has been issued in violation of any applicable securities Laws.

(b) There are no (i) outstanding options, warrants, puts, calls, convertible securities, preemptive or similar rights, (ii) bonds, debentures, notes or other Indebtedness having general voting rights or that are convertible or exchangeable into securities having such rights or (iii) subscriptions or other rights, agreements, arrangements, Contracts or commitments of any character (other than this Agreement and the Ancillary Documents), (A) relating to the issued or unissued shares of the Purchaser or (B) obligating the Purchaser to issue, transfer, deliver or sell or cause to be issued, transferred, delivered, sold or repurchased any options or shares or securities convertible into or exchangeable for such shares, or (C) obligating the Purchaser to grant, extend or enter into any such option, warrant, call, subscription or other right, agreement, arrangement or commitment for such capital shares. There are no outstanding obligations of the Purchaser to repurchase, redeem or otherwise acquire any shares of the Purchaser or to provide funds to make any investment (in the form of a loan, capital contribution or otherwise) in any Person. There are no shareholders agreements, voting trusts or other agreements or understandings to which the Purchaser is a party with respect to the voting of any shares of the Purchaser.

3.6 Indebtedness. Except as otherwise set forth in the balance sheet of the Purchaser, dated March 31, 2018 (the "**Closing Date Balance Sheet**"), immediately prior to the Closing, the Purchaser will

not have any Indebtedness except for certain accounts payable and accrued expenses not to exceed $10,000 in the aggregate.

3.7     <u>SEC Filings and Purchaser Financials</u>

(a)     The Purchaser, since May 12, 2015, has filed all forms, reports, schedules, statements, registration statements, prospectuses and other documents required to be filed or furnished by the Purchaser with the SEC under the Securities Act and/or the Exchange Act, together with any amendments, restatements or supplements thereto, and will file all such forms, reports, schedules, statements and other documents required to be filed subsequent to the date of this Agreement (the "***SEC Reports***").  The SEC Reports (x) were prepared in all material respects in accordance with the requirements of the Securities Act and the Exchange Act, as the case may be, and the rules and regulations thereunder and (y) did not, as of their respective effective dates (in the case of SEC Reports that are registration statements filed pursuant to the requirements of the Securities Act) and at the time they were filed with the SEC (in the case of all other SEC Reports) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.

(b)     The financial statements and notes contained or incorporated by reference in the SEC Reports (the "***Purchaser Financials***"), fairly present in all material respects the financial position and the results of operations, changes in shareholders' equity, and cash flows of the Purchaser at the respective dates of and for the periods referred to in such financial statements, all in accordance with (i) GAAP methodologies applied on a consistent basis throughout the periods involved and (ii) Regulation S-X or Regulation S-K, as applicable (except as may be indicated in the notes thereto and for the omission of notes and audit adjustments in the case of unaudited quarterly financial statements to the extent permitted by Regulation S-X or Regulation S-K, as applicable).

(c)     Except as and to the extent reflected or reserved against in the Purchaser Financials, the Purchaser has not incurred any Liabilities or obligations of the type required to be reflected on a balance sheet in accordance with GAAP that is not adequately reflected or reserved on or provided for in the Purchaser Financials, other than Liabilities of the type required to be reflected on a balance sheet in accordance with GAAP that have been incurred since the Purchaser's formation in the ordinary course of business.

3.8     <u>Shell Company</u>.  The Purchaser is a shell company and except as otherwise shown on the Closing Date Balance Sheet, has (a) no assets or liabilities as of the Closing Date, (b) other than as described on Schedule 3.8, since May 12, 2015, conducted no business other than the public offering of its securities (and the related private offerings), public reporting and related activities.

3.9     <u>Compliance with Laws</u>.  The Purchaser is, and has since May 12, 2015, been, in compliance with all Laws applicable to it and the conduct of its business except for such noncompliance which would not reasonably be expected to have a Material Adverse Effect on the Purchaser, and the Purchaser has not received since May 12, 2015, written notice alleging any violation of applicable Law in any material respect by the Purchaser.

3.10     <u>Actions; Orders; Permits</u>**.**  There is no pending or, to the Knowledge of the Purchaser, threatened material Action to which the Purchaser is subject which would reasonably be expected to have a Material Adverse Effect on the Purchaser.  There is no material Action that the Purchaser has pending against any other Person.  The Purchaser is not subject to any material Orders of any Governmental Authority, nor are any such Orders pending.  The Purchaser holds all material Permits necessary to lawfully conduct its business as presently conducted, and to own, lease and operate its assets and properties, all of

which are in full force and effect, except where the failure to hold such Consent or for such Consent to be in full force and effect would not reasonably be expected to have a Material Adverse Effect on the Purchaser.

3.11    <u>Taxes and Returns</u>.

(a)    The Purchaser has or will have timely filed, or caused to be timely filed, all material Tax Returns required to be filed by it for the tax years 2015 and later, which Tax Returns are true, accurate, correct and complete in all material respects, and has paid, collected or withheld, or caused to be paid, collected or withheld, all material Taxes required to be paid, collected or withheld, other than such Taxes for which adequate reserves in the Purchaser Financials have been established in accordance with GAAP.  There are no audits, examinations, investigations or other proceedings pending against the Purchaser in respect of any Tax, and the Purchaser has not been notified in writing of any proposed Tax claims or assessments against the Purchaser (other than, in each case, claims or assessments for which adequate reserves in the Purchaser Financials have been established in accordance with GAAP or are immaterial in amount).  There are no Liens with respect to any Taxes upon any of the Purchaser's assets, other than Permitted Liens.  The Purchaser has no outstanding waivers or extensions of any applicable statute of limitations to assess any material amount of Taxes.  There are no outstanding requests by the Purchaser for any extension of time within which to file any Tax Return or within which to pay any Taxes shown to be due on any Tax Return.

(b)    Since May 12, 2015, the Purchaser has not (i) changed any Tax accounting methods, policies or procedures except as required by a change in Law, (ii) made, revoked, or amended any material Tax election, (iii) filed any amended Tax Returns or claim for refund or (iv) entered into any closing agreement affecting or otherwise settled or compromised any material Tax Liability or refund.

3.12    <u>Employees and Employee Benefit Plans</u>.  The Purchaser does not (a) have any paid employees or (b) maintain, sponsor, contribute to or otherwise have any Liability under, any Benefit Plans.

3.13    <u>Properties</u>.  The Purchaser does not own, license or otherwise have any right, title or interest in any material Intellectual Property.  The Purchaser does not own or lease any material real property or Personal Property.

3.14    <u>Material Contracts</u>.  Except as set forth on <u>Schedule 3.14</u>, other than this Agreement and the Ancillary Documents, there are no Contracts to which the Purchaser is a party or by which any of its properties or assets may be bound, subject or affected, which (i) creates or imposes a Liability greater than $1,000, (ii) may not be cancelled by the Purchaser on less than sixty (60) days' prior notice without payment of a material penalty or termination fee or (iii) prohibits, prevents, restricts or impairs in any material respect any business practice of the Purchaser as its business is currently conducted, any acquisition of material property by the Purchaser, or restricts in any material respect the ability of the Purchaser from engaging in business as currently conducted by it or from competing with any other Person (each, a "***Purchaser Material Contract***").  All Purchaser Material Contracts have been filed as exhibits to the SEC Reports.

3.15    <u>Transactions with Affiliates</u>.  Except as set forth on Schedule 3.15, there are no contracts or arrangements that are in existence as of the date of this Agreement under which there are any existing or future Liabilities or obligations between the Purchaser and any (a) present or former director, officer or employee or Affiliate of the Purchaser, or any immediate family member of any of the foregoing, or (b) record or beneficial owner of more than five percent (5%) of the Purchaser's outstanding capital stock as of the date hereof.

3.16    <u>Finders and Brokers</u>. Except as set forth on Schedule 3.16, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Purchaser, the Company or any of their respective Affiliates in connection with the transactions contemplated hereby based upon arrangements made by or on behalf of the Purchaser.

3.17    <u>Ownership of Contribution Consideration</u>. All shares of Purchaser Common Stock to be issued and delivered to the Sellers as Contribution Consideration in accordance with <u>Article I</u> shall be, upon issuance and delivery of such Purchaser Common Stock, fully paid and non-assessable, free and clear of all Liens, other than restrictions arising from applicable securities Laws and any Liens incurred by the Company or any Seller, and the issuance and sale of such Purchaser Common Stock pursuant hereto will not be subject to or give rise to any preemptive rights or rights of first refusal.

3.18    <u>Independent Investigation</u>. The Purchaser has conducted its own independent investigation, review and analysis of the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of the Company for such purpose. The Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, it has relied solely upon its own investigation and the express representations and warranties of the Company set forth in <u>Article IV</u> (including the related portions of the Company Disclosure Schedules); and (b) none of the Company nor its respective Representatives have made any representation or warranty as to the Company, or this Agreement, except as expressly set forth in <u>Article IV</u> (including the related portions of the Company Disclosure Schedules).

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except as set forth in the disclosure schedules delivered by the Company to the Purchaser on the date hereof (the "**Company Disclosure Schedules**"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer, the Company hereby represents and warrants to the Purchaser, as of the date hereof and as of the Closing, as follows:

4.1    <u>Organization and Standing</u>. The Company is a Nevada corporation and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted. The Company has heretofore made available to the Purchaser accurate and complete copies of the Organizational Documents of the Company, as currently in effect. The Company is not in violation of any provision of its Organizational Documents.

4.2    <u>Authorization; Binding Agreement</u>. The Company has all requisite corporate power and authority to execute and deliver this Agreement and each Ancillary Document to which it is or is required to be a party, to perform the Company's obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. This Agreement has been, and each Ancillary Document to which the Company is a party shall be when delivered, duly and validly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties hereto and thereto, constitutes, or when delivered shall constitute, the valid and binding obligation of the Company, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by the Enforceability Exceptions.

4.3    <u>Subsidiaries</u>. The Company does not own, of record or beneficially, or control any direct or indirect equity or other interest, or any right (contingent or otherwise) to acquire the same, in any corporation, partnership, limited liability company, joint venture, association or other entity.

4.4     <u>Governmental Approvals</u>. No Consent of or with any Governmental Authority on the part of the Company is required to be obtained or made in connection with the execution, delivery or performance by the Company of this Agreement or any Ancillary Documents or the consummation by the Company of the transactions contemplated hereby or thereby other than such filings as are expressly contemplated by this Agreement and (b) pursuant to Antitrust Laws.

4.5     <u>Non-Contravention</u>. The execution and delivery by the Company of this Agreement and each Ancillary Document to which the Company is a party or otherwise bound, and the consummation by the Company of the transactions contemplated hereby and thereby and compliance by the Company with any of the provisions hereof and thereof, will not (a) conflict with or violate any provision of the Company's Organizational Documents, (b) subject to obtaining the Consents from Governmental Authorities referred to in <u>Section 4.4</u> hereof, the waiting periods referred to therein having expired, and any condition precedent to such Consent or waiver having been satisfied, conflict with or violate any Law, Order or Consent applicable to the Company or any of its properties or assets, or (c) (i) violate, conflict with or result in a breach of, (ii) constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, (iii) result in the termination, withdrawal, suspension, cancellation or modification of, (iv) accelerate the performance required by the Company under, (v) result in a right of termination or acceleration under, (vi) give rise to any obligation to make payments or provide compensation under, (vii) result in the creation of any Lien upon any of the properties or assets of the Company under, (viii) give rise to any obligation to obtain any third party Consent or provide any notice to any Person or (ix) give any Person the right to declare a default, exercise any remedy, claim a rebate, chargeback, penalty or change in delivery schedule, accelerate the maturity or performance, cancel, terminate or modify any right, benefit, obligation or other term under, any of the terms, conditions or provisions of any material contract of the Company.

4.6     <u>Financial Statements</u>. As used herein, the term "**_Company Financials_**" means the (i) audited financial statements of the Company (including, in each case, any related notes thereto), consisting of the audited balance sheets of the Company as of March 31, 2018, and the related audited income statements, changes in stockholder equity and statements of cash flows for the period from inception to March 31, 2018, each audited in accordance with GAAP standards by a PCAOB qualified auditor (the "**_Audited Company Financials_**"), (ii) pro forma financial information for the Company after the Contribution, (iii) if the Closing occurs prior to August 14, 2018 but the Super 8-K (as defined in <u>Section 6.6(b)</u> herein) is filed after August 14, 2018, the unaudited financial statements, consisting of the balance sheet of the Company as of June 30, 2018, and (iv) if the Closing occurs after August 14, 2018, the unaudited financial statements, consisting of the balance sheet of the Company for the applicable fiscal quarters as may be required for the SEC filing. True and correct copies of the Company Financials have been provided to the Purchaser.  The Company Financials (i) accurately reflect the books and records of the Company as of the times and for the periods referred to therein, (ii) were prepared in accordance with GAAP, consistently applied throughout and among the periods involved (except that the unaudited statements exclude the footnote disclosures and other presentation items required for GAAP and exclude year-end adjustments which will not be material in amount), and (iii) fairly present in all material respects the financial position of the Company as of the respective dates thereof and the results of the operations and cash flows of the Company for the periods indicated.  The Company has never been subject to the reporting requirements of Sections 13(a) and 15(d) of the Exchange Act.

4.7     <u>Absence of Certain Changes</u>. Since January 12, 2018 (date of inception), the Company has (a) conducted its business only in the ordinary course of business consistent with past practice, (b) not been subject to a Material Adverse Effect and (c) has not taken any action or committed or agreed to take any action that would be prohibited by <u>Section 6.2(b)</u> if such action were taken on or after the date hereof without the consent of the Purchaser.

4.8     Compliance with Laws. The Company has not nor has been in material conflict or material non-compliance with, or in material default or violation of, nor has the Company received, since January 12, 2018 (date of inception), any written or, to the Knowledge of the Company, oral notice of any material conflict or non-compliance with, or material default or violation of, any applicable Laws by which it or any of its properties, assets, employees, business or operations are or were bound or affected.

4.9     Litigation. There is no (a) Action of any nature pending or, to the Company's Knowledge, threatened, nor is there any reasonable basis for any Action to be made (and no such Action has been brought or, to the Company's Knowledge, threatened); or (b) Order pending now or rendered by a Governmental Authority, in either case of (a) or (b) by or against the Company, its members, its business, equity securities or assets.

4.10     Material Contracts. The Company has not received notice of breach on any material contract.

4.11     Taxes and Returns. The Company has or will have timely filed, or caused to be timely filed, all federal, state and local Tax Returns required to be filed by it (taking into account all available extensions), which Tax Returns are true, accurate, correct and complete in all material respects. The Company has complied with all applicable Laws relating to Tax.

4.12     Title to and Sufficiency of Assets. The Company has good and marketable title to, or a valid leasehold interest in or right to use, all of its assets, free and clear of all Liens other than (a) Permitted Liens, (b) the rights of lessors under leasehold interests, and (c) Liens specifically identified on the Interim Balance Sheet.  The assets (including contractual rights) of the Company constitute all of the assets, rights and properties that are used in the operation of the businesses of the Company as it is now conducted and presently proposed to be conducted or that are used or held by the Company for use in the operation of the businesses of the Company, and taken together, are adequate and sufficient for the operation of the businesses of the Company as currently conducted and as presently proposed to be conducted.

4.13     No Brokers.  The Company has not incurred, nor will it incur, directly or indirectly, any liability for brokerage or finders' fees or agents' commissions or charges or any similar charges in connection with this Agreement or any transactions contemplated hereby.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

Except as set forth in the disclosure schedules delivered by the Sellers to the Purchaser on the date hereof (the "Seller Disclosure Schedules"), the Section numbers of which are numbered to correspond to the Section numbers of this Agreement to which they refer, each of the Sellers, severally, hereby represents and warrants to the Purchaser as of the date hereof and as of the Closing, as follows:

5.1     Authority, Etc. Each of the Sellers has the requisite power and authority to enter into this Agreement and to carry out such Seller's obligations hereunder. The execution and delivery of this Agreement and each Ancillary Document to which it is a party and the consummation of the transactions contemplated hereby and thereby (a) have been duly and validly authorized by each Seller, and (b) no other joint venture proceedings, other than as set forth elsewhere in the Agreement, on the part of such Seller are necessary to authorize the execution and delivery of this Agreement and each Ancillary Document to which it is a party or to consummate the transactions contemplated hereby and thereby.  This Agreement has been, and each Ancillary Document to which such Seller is a party shall be when delivered, duly and validly executed and delivered by such Seller and, assuming the due authorization, execution and delivery of this Agreement and such Ancillary Documents by the other parties hereto and thereto, constitutes, or when

delivered shall constitute, the valid and binding obligation of such Seller, enforceable against the Purchaser in accordance with its terms, except to the extent that enforceability thereof may be limited by the Enforceability Exceptions.

5.2    Title to Properties, Liens and Encumbrances. Each of the Sellers have good title to each of their Contributed Securities of the Company, free and clear free of all claims, liens, security interests and other rights and encumbrances, and as a group the Sellers are owners of all the Company Interests.

5.3    Reliance. This Agreement is made with the Sellers in reliance upon each Seller's representation to the Purchaser, which by such Seller's execution of this Agreement, such Seller hereby confirms, that the shares of the Purchaser's Common stock constituting the Contribution Consideration to be acquired by such Seller (the "*Securities*") will be acquired for investment for such Seller's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Seller has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, each Seller further represents that such Seller does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Securities. The Purchaser has not been formed for the specific purpose of acquiring the Securities.

5.4    Investment Representations. Each Seller understands that the shares of Purchaser Common Stock have not been registered under the Securities Act, or under the securities laws of any state and, therefore, cannot be resold, pledged, assigned or otherwise disposed of unless they are subsequently registered under the Securities Act and under applicable securities laws of certain states or unless an exemption from such registration is available. Each Seller understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. Each Seller acknowledges that the Purchaser has no obligation to register or qualify the Securities for resale. Each Seller further acknowledges that (a) there is no assurance that any exemption from registration or qualification will be available, and (b) if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Purchaser which are outside of such Seller's control (including without limitation any current public information requirements of Rule 144 promulgated under the Securities Act or any similar or successor rule or regulation), and which the Purchaser is under no obligation and may not be able to satisfy, and therefore that there is no assurance that any such exemption will allow such Seller to dispose of, or otherwise transfer, all or any portion of the Securities.

5.5    Legends. Each Seller understands that the Securities and any securities issued in respect of or exchange for the Securities, may bear one or all of the following legends:

        (a)    "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SALE, TRANSFER, ASSIGNMENT, PLEDGE OR HYPOTHOCATION OF SUCH SECURITIES MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT, PLEDGE OR HYPOTHOCATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS UNDER THE SECURITIES ACT OF 1933, AS AMENDED."

(b)    Any legend required by the securities laws of any state to the extent such laws are applicable to the Securities represented by the certificate so legended.

5.6    <u>Accredited Investor</u>.  Each Seller is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

5.7    <u>Risks</u>.  Each Seller is aware that the Securities are highly speculative and that there can be no assurance as to what return, if any, there may be.  Each Seller is aware that the Purchaser may issue additional securities in the future which could result in the dilution of such Seller's ownership interest in the Purchaser.

**ARTICLE VI**
**COVENANTS**

6.1    <u>Access and Information</u>  The Purchaser shall give, and shall direct its Representatives to give, the Company and its Representatives, at reasonable times during normal business hours and upon reasonable intervals and notice, access to all offices and other facilities and to all employees, properties, Contracts, agreements, commitments, books and records, financial and operating data and other information (including Tax Returns, internal working papers, client files, client Contracts and director service agreements), of or pertaining to the Purchaser or its Subsidiaries, as the Company or its Representatives may reasonably request regarding the Purchaser, its Subsidiaries and their respective businesses, assets, Liabilities, financial condition, prospects, operations, management, employees and other aspects (including unaudited quarterly financial statements, including a consolidated quarterly balance sheet and income statement, a copy of each material report, schedule and other document filed with or received by a Governmental Authority pursuant to the requirements of applicable securities Laws, and independent public accountants' work papers (subject to the consent or any other conditions required by such accountants, if any)) and to reasonably cooperate with the Company and its Representatives in their investigation; provided, however, that the Company and its Representatives shall conduct any such activities in such a manner as not to unreasonably interfere with the business or operations of the Purchaser or any of its Subsidiaries.

6.2    <u>No Solicitation</u>.

(a)    For purposes of this Agreement, (i) an "***Acquisition Proposal***" means any inquiry, proposal or offer, or any indication of interest in making an offer or proposal, from any Person or group at any time relating to an Alternative Transaction, and (ii) an "***Alternative Transaction***" means (A) with respect to the Company and its Affiliates, a transaction (other than the transactions contemplated by this Agreement) concerning the sale of (x) all or any material part of the business or assets of the Company (other than in the ordinary course of business consistent with past practice) or (y) any of the shares or other equity interests or profits of the Company, in any case, whether such transaction takes the form of a sale of shares or other equity, assets, merger, consolidation, issuance of debt securities, management Contract, joint venture or partnership, or otherwise and (B) with respect to the Purchaser and its Affiliates, a transaction (other than the transactions contemplated by this Agreement) concerning a Business Combination.

(b)    In order to induce the other Parties to continue to commit to expend management time and financial resources in furtherance of the transactions contemplated hereby, each Party shall not, and shall cause its Representatives to not, without the prior written consent of the Company and the Purchaser, directly or indirectly, (i) solicit, assist, initiate or facilitate the making, submission or announcement of, or intentionally encourage, any Acquisition Proposal, (ii) furnish any non-public information regarding such Party or its Affiliates or their respective businesses, operations, assets,

Liabilities, financial condition, prospects or employees to any Person or group (other than a Party to this Agreement or their respective Representatives) in connection with or in response to an Acquisition Proposal, (iii) engage or participate in discussions or negotiations with any Person or group with respect to, or that could be expected to lead to, an Acquisition Proposal, (iv) approve, endorse or recommend, or publicly propose to approve, endorse or recommend, any Acquisition Proposal, (v) negotiate or enter into any letter of intent, agreement in principle, acquisition agreement or other similar agreement related to any Acquisition Proposal, or (vi) release any third Person from, or waive any provision of, any confidentiality agreement to which such Party is a party.

(c)     Each Party shall notify the others as promptly as practicable (and in any event within 48 hours) orally and in writing of the receipt by such Party or any of its Representatives of (i) any bona fide inquiries, proposals or offers, requests for information or requests for discussions or negotiations regarding or constituting any Acquisition Proposal or any bona fide inquiries, proposals or offers, requests for information or requests for discussions or negotiations that could be expected to result in an Acquisition Proposal, and (ii) any request for non-public information relating to such Party or its Affiliates, specifying in each case, the material terms and conditions thereof (including a copy thereof if in writing or a written summary thereof if oral) and the identity of the party making such inquiry, proposal, offer or request for information.  Each Party shall keep the others promptly informed of the status of any such inquiries, proposals, offers or requests for information.  Each Party shall, and shall cause its Representatives to, immediately cease and cause to be terminated any solicitations, discussions or negotiations with any Person with respect to any Acquisition Proposal and shall, and shall direct its Representatives to, cease and terminate any such solicitations, discussions or negotiations.

6.3     Notification of Certain Matters. Each of the Parties shall give prompt notice to the other Parties if such Party or its Affiliates:  (a) fails to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it or its Affiliates hereunder in any material respect; (b) receives any notice or other communication in writing from any third party (including any Governmental Authority) alleging (i) that the Consent of such third party is or may be required in connection with the transactions contemplated by this Agreement or (ii) any non-compliance with any Law by such Party or its Affiliates; (c) receives any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; (d) discovers any fact or circumstance that, or becomes aware of the occurrence or non-occurrence of any event the occurrence or non-occurrence of which, would reasonably be expected to cause or result in any of the conditions to set forth in Article VIII not being satisfied or the satisfaction of those conditions being materially delayed; or (e) becomes aware of the commencement or threat, in writing, of any Action against such Party or any of its Affiliates, or any of their respective properties or assets, or, to the Knowledge of such Party, any officer, director, partner, member or manager, in his, her or its capacity as such, of such Party or of its Affiliates with respect to the consummation of the transactions contemplated by this Agreement.  No such notice shall constitute an acknowledgement or admission by the Party providing the notice regarding whether or not any of the conditions to the Closing have been satisfied or in determining whether or not any of the representations, warranties or covenants contained in this Agreement have been breached.

6.4     Tax Matters. For federal income tax purposes, the Contribution is intended to constitute a "reorganization" within the meaning of Section 351 of the Code, as mutually agreed to by the Parties. None of the Parties shall (and each of the Parties shall cause their respective Subsidiaries not to) take any action, or fail to take any action, that could reasonably be expected to cause the Contribution to fail to qualify as a "reorganization" within the meaning of Section 351 of the Code. The Parties intend to report and, except to the extent otherwise required by Law, shall report, for federal income tax purposes, the Contribution as a "reorganization" within the meaning of Section 351 of the Code.

6.5    Further Assurances.  The Parties hereto shall further cooperate with each other and use their respective commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, necessary, proper or advisable on their part under this Agreement and applicable Laws to consummate the transactions contemplated by this Agreement as soon as reasonably practicable, including preparing and filing as soon as practicable all documentation to effect all necessary notices, reports and other filings.

6.6    Public Announcements and Filings.

(a)    The Parties shall mutually agree upon and, as promptly as practicable after the execution of this Agreement (but in any event within four (4) Business Days thereafter), issue a press release announcing the execution of this Agreement (the "**Signing Press Release**").

(b)    Promptly after the issuance of the Signing Press Release, the Purchaser shall file a current report on Form 8-K (the "**Super 8-K**") with the Signing Press Release and a description of this Agreement as required by Federal Securities Laws, which the Company shall review, comment upon and approve (which approval shall not be unreasonably withheld, conditioned or delayed) prior to filing (with the Company reviewing, commenting upon and approving such Super 8-K in any event no later than the third (3rd) Business Day after the execution of this Agreement).

(c)    The Parties shall mutually agree upon and, as promptly as practicable after the Closing (but in any event within four (4) Business Days thereafter), issue a press release announcing the consummation of the transactions contemplated by this Agreement (the "**Closing Press Release**"). Promptly after the issuance of the Closing Press Release, the Purchaser shall file a current report on Form 8-K (the "**Closing Filing**") with the Closing Press Release and a description of the Closing as required by Federal Securities Laws which the Company shall review, comment upon and approve (which approval shall not be unreasonably withheld, conditioned or delayed) prior to filing.

(d)    The Parties shall mutually agree upon and, as promptly as practicable after the execution of this Agreement (but in any event within ten (10) days thereafter), file a current report on Form 8-K reporting a change in control of the Company and a Rule 14f-1 Information Statement (the "**14f Filing**"). In addition, those directors and officers or other insiders or Affiliates who will no longer have such status as a result of this Agreement and the contemplated transactions, shall file final Form 4's with the SEC within two (2) days following the effective date of the 14f Filing as to all current directors.

(e)    The Parties shall mutually agree upon and, as promptly as practicable after the Closing Date, file an information statement on a Schedule 14C with the SEC reporting a name change and mail such Schedule 14C to the shareholders of the Purchaser (the "**Schedule 14C**").

(f)    In connection with the preparation of the Signing Press Release, the Super 8-K, the Closing Filing, the Closing Press Release, the 14f Filing, the Schedule 14C or any other report, statement, filing notice or application made by or on behalf of a Party to any Governmental Authority or other third party in connection with the transactions contemplated hereby, each Party shall, upon request by any other Party, furnish the Parties with all information concerning themselves, their respective managers, members, directors, officers and equity holders, and such other matters as may be reasonably necessary or advisable in connection with the transactions contemplated hereby, or any other report, statement, filing, notice or application made by or on behalf of a Party to any third party and/ or any Governmental Authority in connection with the transactions contemplated hereby.

(g)    Purchaser shall be solely responsible for the costs and expenses relating to the Signing Press Release, the Super 8-K, the Closing Press Release, the Closing Filing, the 14f Filing, the

13

Schedule 14C and related documents, instruments or filings. Purchaser shall be responsible for any Form 10-K filing, and any related documents, instruments or filings due to be filed with the SEC on or before the Closing Date.

6.7    Confidential Information. The Parties hereby agree that in the event this Agreement is terminated in accordance with Section 9.1, for a period of two (2) years after such termination, they shall, and shall cause their Representatives to: (i) treat and hold in strict confidence any Confidential Information, and will not use for any purpose (except in connection with the consummation of the transactions contemplated by this Agreement or the Ancillary Documents, performing their obligations hereunder or thereunder, enforcing their rights hereunder or thereunder), nor directly or indirectly disclose, distribute, publish, disseminate or otherwise make available to any third party any of the Confidential Information without the other Party's prior written consent; and (ii) in the event that either Party or its Affiliates or Representatives, in the event this Agreement is terminated in accordance with Section 9.1, for a period of two (2) years after such termination, becomes legally compelled to disclose any Confidential Information, (A) provide the other Party with prompt written notice of such requirement so that that Party or an Affiliate thereof may seek a protective Order or other remedy or waive compliance with this Section 6.7, and (B) in the event that such protective Order or other remedy is not obtained, or the relevant Party waives compliance with this Section 6.7, furnish only that portion of such Confidential Information which is legally required to be provided as advised in writing by outside counsel and to exercise its commercially reasonable efforts to obtain assurances that confidential treatment will be accorded such Confidential Information.  In the event that this Agreement is terminated and the transactions contemplated hereby are not consummated, the Parties shall, and shall cause their Affiliates and Representatives to, promptly deliver to the other Party any and all copies (in whatever form or medium) of Confidential Information and destroy all notes, memoranda, summaries, analyses, compilations and other writings related thereto or based thereon.

## ARTICLE VII
## SURVIVAL AND INDEMNIFICATION

7.1    Survival.

(a)    All representations and warranties of the Purchaser contained in this Agreement (including all schedules and exhibits hereto and all certificates, documents, instruments and undertakings furnished pursuant to this Agreement) shall survive the Closing through and until and including June 27, 2020.  All covenants, obligations and agreements of the Purchaser contained in this Agreement (including all schedules and exhibits hereto and all certificates, documents, instruments and undertakings furnished by the Purchaser pursuant to this Agreement), including any indemnification obligations, shall survive the Closing and continue until fully performed in accordance with their terms.

(b)    The representations and warranties of the Company contained in this Agreement or in any certificate or instrument delivered by or on behalf of Company pursuant to this Agreement shall not survive the Closing, and from and after the Closing, the Company shall not have any further obligations, nor shall any claim be asserted or action be brought against the Purchaser. The covenants and agreements made by the Company in this Agreement or in any certificate or instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such covenants or agreements, shall not survive the Closing, except for those covenants and agreements contained herein and therein that by their terms apply or are to be performed in whole or in part after the Closing (which such covenants shall survive the Closing and continue until fully performed in accordance with their terms).

## ARTICLE VIII
## CLOSING CONDITIONS

8.1 <u>Conditions to Obligations of the Company</u>.  The obligations of the Company to consummate the Contribution and the other transactions contemplated by this Agreement are subject to the satisfaction or written waiver (by the Company) of the following conditions:

(a) *Representations and Warranties*.  All of the representations and warranties of the Purchaser set forth in this Agreement and in any certificate delivered by the Purchaser pursuant hereto shall be true and correct on and as of the date of this Agreement and on and as of the Closing Date as if made on the Closing Date, except for (i) those representations and warranties that address matters only as of a particular date (which representations and warranties shall have been accurate as of such date), and (ii) any failures to be true and correct that (without giving effect to any qualifications or limitations as to materiality or Material Adverse Effect), individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect on, or with respect to, the Purchaser.

(b) *Agreements and Covenants*.  The Purchaser shall have performed in all material respects all of the Purchaser's obligations and complied in all material respects with all of the Purchaser's agreements and covenants under this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c) *No Material Adverse Effect*.  No Material Adverse Effect shall have occurred with respect to the Purchaser since the date of this Agreement which is continuing and uncured.

(d) *Closing Deliveries.*

(i) OFFICER CERTIFICATE.  The Purchaser shall have delivered to the Company a certificate, dated the Closing Date, signed by an executive officer of the Purchaser in such capacity, certifying as to the satisfaction of the conditions specified in <u>Sections 8.1(a)</u>, <u>8.1(b)</u> and <u>8.1(c)</u>.

(ii) SECRETARY CERTIFICATE.  The Purchaser shall have delivered to the Company a certificate from its secretary or other executive officer certifying as to, and attaching, (A) copies of the Purchaser's Organizational Documents as in effect as of the Closing Date (immediately prior to giving effect to the Conversion), (B) the resolutions of the Purchaser's board of directors authorizing the execution, delivery and performance of this Agreement and each of the Ancillary Documents to which it is a party or by which it is bound, and the consummation of the transactions contemplated hereby and thereby, and (C) the incumbency of officers authorized to execute this Agreement or any Ancillary Document to which the Purchaser is or is required to be a party or otherwise bound.

(iii) GOOD STANDING.  The Purchaser shall have delivered to the Company a good standing certificate (or similar documents applicable for such jurisdictions) for the Purchaser certified as of a date no later than thirty (30) days prior to the Closing Date from the proper Governmental Authority of the Purchaser's jurisdiction of organization and from each other jurisdiction in which the Purchaser is qualified to do business as a foreign entity as of the Closing, in each case to the extent that good standing certificates or similar documents are generally available in such jurisdictions.

(iv) RESIGNATIONS AND ELECTIONS. The Purchaser shall have obtained and deliver to the Company at or prior to the Closing the resignation of each officer of the Purchaser and the board resolutions of the Purchaser appointing, effective at Closing, Joe Page as Chief Technical Officer and Chairman, Gert Funk as Chief Executive Officer and Bennett Yankowitz as Chief Financial Officer, and the elections (subject to requirements of Rule 14f-1 of the Exchange Act) of Joe Page and Gert Funk as additional directors of the Purchaser .

15

8.2     Conditions to Obligations of the Purchaser.   The obligations of the Purchaser to consummate the Contribution and the other transactions contemplated by this Agreement are subject to the satisfaction or written waiver (by the Purchaser) of the following conditions:

(a)     *Representations and Warranties*.  All of the representations and warranties of the Company set forth in this Agreement and in any certificate delivered by the Company, shall be true and correct on and as of the date of this Agreement and on and as of the Closing Date as if made on the Closing Date, except for (i) those representations and warranties that address matters only as of a particular date (which representations and warranties shall have been accurate as of such date), and (ii) any failures to be true and correct that (without giving effect to any qualifications or limitations as to materiality or Material Adverse Effect), individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect on, or with respect to, the Company.

(b)     *Agreements and Covenants*.  The Company shall have performed in all material respects all of its obligations and complied in all material respects with all of its agreements and covenants under this Agreement to be performed or complied with by it on or prior to the Closing Date.

(c)     *No Material Adverse Effect*.  No Material Adverse Effect shall have occurred with respect to the Company since the date of this Agreement which is continuing and uncured.

(d)     Closing Deliveries.

(i)     OFFICER CERTIFICATE.  The Purchaser shall have received a certificate from the Company, dated as the Closing Date, signed by an executive officer of the Company in such capacity, certifying as to the satisfaction of the conditions specified in Sections 8.2(a), 1.1(b) and 1.1(c).

(ii)     SECRETARY CERTIFICATE.  The Company shall have delivered to the Purchaser a certificate executed by the Company's secretary certifying as to the validity and effectiveness of, and attaching, (A) copies of the Company's Organizational Documents as in effect as of the Closing Date (immediately prior to the Closing), and (B) the incumbency of officers of the Company authorized to execute this Agreement or any Ancillary Document to which the Company is or is required to be a party or otherwise bound.

8.3     Frustration of Conditions. Notwithstanding anything contained herein to the contrary, no Party may rely on the failure of any condition set forth in this Article VIII to be satisfied if such failure was caused by the failure of such Party or its Affiliates (or with respect to the Company, the Company or Seller) failure to comply with or perform any of its covenants or obligations set forth in this Agreement.

## ARTICLE IX
## TERMINATION AND EXPENSES

9.1     Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing as follows:

(a)     by mutual written consent of the Purchaser and the Company;

(b)     by written notice by the Purchaser or the Company if any of the conditions to the Closing set forth in Article VIII have not been satisfied or waived by August 1, 2018 (the "***Outside Date***"); provided, however, the right to terminate this Agreement under this Section 9.1(b) shall not be available to a Party if the breach or violation by such Party or its Affiliates of any representation, warranty,

covenant or obligation under this Agreement was the cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date;

(c)  by written notice by either the Purchaser or the Company if a Governmental Authority of competent jurisdiction shall have issued an Order or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such Order or other action has become final and non-appealable; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(c) shall not be available to a Party if the failure by such Party or its Affiliates to comply with any provision of this Agreement has been a substantial cause of, or substantially resulted in, such action by such Governmental Authority;

(d)  by written notice by the Company, if (i) there has been a material breach by the Purchaser of any of its representations, warranties, covenants or agreements contained in this Agreement, or if any representation or warranty of the Purchaser shall have become materially untrue or materially inaccurate, in any case, which would result in a failure of a condition set forth in Section 8.1(a) or Section 8.1(b) to be satisfied (treating the Closing Date for such purposes as the date of this Agreement or, if later, the date of such breach), and (ii) the breach or inaccuracy is incapable of being cured or is not cured within the earlier of (A) twenty (20) days after written notice of such breach or inaccuracy is provided by the Company or (B) the Outside Date;

(e)  by written notice by the Purchaser, if (i) there has been a breach by the Company of any of its representations, warranties, covenants or agreements contained in this Agreement, or if any representation or warranty of such Parties shall have become untrue or inaccurate, in any case, which would result in a failure of a condition set forth in Section 8.2(a) to be satisfied (treating the Closing Date for such purposes as the date of this Agreement or, if later, the date of such breach), and (ii) the breach or inaccuracy is incapable of being cured or is not cured within the earlier of (A) twenty (20) days after written notice of such breach or inaccuracy is provided by the Purchaser or (B) the Outside Date;

(f)  by written notice by the Purchaser, if there shall have been a Material Adverse Effect on the Company or its Subsidiaries following the date of this Agreement which is uncured and continuing; or

(g)  by written notice by the Purchaser to the Company if (i) the Company shall not have delivered to the Purchaser on or prior to August 14, 2018 the PCAOB Audited Financials, or (ii) if the PCAOB Audited Financials are substantially different from the Audited Company Financials in an adverse manner, including any of the consolidated revenues, net income or assets being at least five percent (5%) less than the amounts set forth in the Audited Company Financials or the consolidated liabilities being at least five percent (5%) greater than the amounts set forth in the Audited Company Financials.

9.2  Effect of Termination. This Agreement may only be terminated in the circumstances described in Section 9.1 and pursuant to a written notice delivered by the applicable Party to the other applicable Parties, which sets forth the basis for such termination, including the provision of Section 9.1 under which such termination is made.  In the event of the valid termination of this Agreement pursuant to Section 9.1, (i) this Agreement shall forthwith become void, , and (ii) there shall be no Liability on the part of any Party or any of their respective Representatives, and all rights and obligations of each Party shall cease, except: (x) Section 9.3, Article X, Article XI and this Section 9.2 shall survive the termination of this Agreement, and (y) nothing herein shall relieve any Party from Liability for any willful breach of any representation, warranty, covenant or obligation under this Agreement or any Fraud Claim against such Party, in either case, prior to termination of this Agreement.

9.3     Fees and Expenses.  Except as provided otherwise in this Agreement, all Expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such expenses.  As used in this Agreement, "**Expenses**" shall include all out-of-pocket expenses (including all fees and expenses of counsel, accountants, investment bankers, financial advisors, financing sources, experts and consultants to a Party hereto or any of its Affiliates) incurred by a Party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution or performance of this Agreement or any Ancillary Document related hereto and all other matters related to the consummation of this Agreement.

**ARTICLE X**
**OTHER AGREEMENT OF THE PARTIES**

10.1 Piggy-Back Registration Rights.

(a)     If the Company proposes to register any of the Purchaser Common Stock after the first anniversary of the Closing Date, but prior to the third anniversary of the Closing Date, it will give prompt written notice to PacificWave Partners and Bennett Yankowitz of its intention to effect such registration (the "**Incidental Registration**"). Within five (5) Business Days of receiving such written notice of an Incidental Registration, Sellers, PacificWave Partners or its Affiliates, or Bennett Yankowitz (the "**Piggy-Back Parties**") may each make a written request (the "**Piggy-Back Request**") that the Company include in the proposed Incidental Registration all, or a portion, of the Registrable Shares owned by such Piggy-Back Party (which Piggy-Back Request shall set forth the number of Registrable Shares intended to be disposed of by the Piggy-Back Party and the intended method of disposition thereof). For the purposes of Section 10.1 "**Registrable Shares**" shall mean the Purchaser Common Stock held by any of the Piggy-Back Parties at Closing; provided that any particular securities of such Registrable Shares shall cease to be Registrable Shares when (i) any registration statement of the Company that covers the sale of such securities shall have become effective under the Securities Act and such securities shall have been disposed of in accordance with such registration statement, (ii) such securities shall have become eligible to be sold to the public by the Purchaser pursuant to Rule 144 under the Securities Act, or (iii) subsequent disposition of such securities shall not require registration or qualification of them under the Securities Act or of any similar state law then in force.

(b)     The Company will use its commercially reasonable efforts to include in any Incidental Registration all Registrable Shares which the Company has been requested to register pursuant to any timely Piggy-Back Request, to the extent required to permit the disposition (in accordance with the intended methods thereof as aforesaid) of the Registrable Shares so to be registered. If the Registrable Shares are not included in an Incidental Registration by the 90th calendar day after the Closing Date, then the Company shall immediately prepare and file a registration statement on such form as may be required covering the Registrable Shares.

(c)     Notwithstanding the preceding Sections 10.1(a) and 10.1(b): (i) the Company shall not be obligated pursuant to this Section 10.1 to effect a registration of Registrable Shares requested pursuant to a timely Piggy-Back Request if the Company discontinues the related Incidental Registration at any time prior to the effective date of any registration statement filed in connection therewith; (ii) if a registration pursuant to this Section 10.1 involves an underwritten offering, and the managing underwriter (or, in the case of an offering that is not underwritten, an investment banker) shall advise the Company that, in its opinion, the number of securities requested and otherwise proposed to be included in such registration exceeds the number which can be sold in such offering without adversely affecting the marketability of the offering, the Company will include in such registration the number which the Company is so advised can be sold in such offering in the following order: first, the securities the Company proposes to sell for its own account in such registration, second, the Registrable Shares of the Piggy-Back Party requesting to be

included in such Registration, through a timely Piggy-Back Request, and, third, all other securities requested to be included in such registration on a pro rata basis; and (iii) if the Company is engaged in, or has definitive plans to engage in, any activity or negotiations that, in the good faith determination of the managers of the Company, would be adversely affected by disclosure that would be required in connection with a registration to the material detriment of the Company, then the Company may delay such registration for a period of 20 days from the date of termination or disclosure of such activity or negotiations.

## ARTICLE XI
## MISCELLANEOUS

11.1 <u>Notices</u>. All notices, consents, waivers and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered (i) in person, (ii) by facsimile or other electronic means, with affirmative confirmation of receipt, (iii) one Business Day after being sent, if sent by reputable, nationally recognized overnight courier service or (iv) three (3) Business Days after being mailed, if sent by registered or certified mail, pre-paid and return receipt requested, in each case to the applicable Party at the following addresses (or at such other address for a Party as shall be specified by like notice):

| | |
|---|---|
| *If to the Purchaser, to* | B4MC Gold Mines, Inc. |
| | c/o Bennett J. Yankowitz |
| | 3651 Lindell Road, Suite D565 |
| | Las Vegas, NV 89103 |
| | bjy@yankowitzlaw.com |
| *If to the Company, to:* | Henrik Rouf |
| | c/o PacificWave Partners |
| | 468 N. Camden Dr., Suite 350 |
| | Beverly Hills, CA 90210 |
| | hrouf@pacificwavepartners.com |

11.2 <u>Binding Effect; Assignment</u>. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns. This Agreement shall not be assigned by operation of Law or otherwise without the prior written consent of the Purchaser and the Company and any assignment without such consent shall be null and void; <u>provided</u> that no such assignment shall relieve the assigning Party of its obligations hereunder.

11.3 <u>Third Parties</u>. Nothing contained in this Agreement or in any instrument or document executed by any party in connection with the transactions contemplated hereby shall create any rights in, or be deemed to have been executed for the benefit of, any Person that is not a Party hereto or thereto or a successor or permitted assign of such a Party.

11.4 <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by, construed and enforced in accordance with the Laws of the State of Nevada without regard to the conflict of laws principles thereof. All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any state or federal court located in Las Vegas, Nevada (or in any appellate court thereof) (the "***Specified Courts***"). Each Party hereto hereby (a) submits to the exclusive jurisdiction of any Specified Court for the purpose of any Action arising out of or relating to this Agreement brought by any Party hereto and (b) irrevocably waives, and agrees not to assert by way of motion, defense or

otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated hereby may not be enforced in or by any Specified Court.  Each Party agrees that a final judgment in any Action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party irrevocably consents to the service of the summons and complaint and any other process in any other Action relating to the transactions contemplated by this Agreement, on behalf of itself, or its property, by personal delivery of copies of such process to such Party at the applicable address set forth in <u>Section 11.1</u>.  Nothing in this <u>Section 11.4</u> shall affect the right of any Party to serve legal process in any other manner permitted by Law.

11.5 <u>WAIVER OF JURY TRIAL</u>. EACH OF THE PARTIES HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY ACTION, SEEK TO ENFORCE THAT FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.5</u>.

11.6 <u>Specific Performance</u>. Each Party acknowledges that the rights of each Party to consummate the transactions contemplated hereby are unique, recognizes and affirms that in the event of a breach of this Agreement by any Party, money damages may be inadequate and the non-breaching Parties may have not adequate remedy at law, and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by an applicable Party in accordance with their specific terms or were otherwise breached.  Accordingly, each Party shall be entitled to seek an injunction or restraining order to prevent breaches of this Agreement and to seek to enforce specifically the terms and provisions hereof, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such Party may be entitled under this Agreement, at law or in equity.

11.7 <u>Severability</u>. In case any provision in this Agreement shall be held invalid, illegal or unenforceable in a jurisdiction, such provision shall be modified or deleted, as to the jurisdiction involved, only to the extent necessary to render the same valid, legal and enforceable, and the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby nor shall the validity, legality or enforceability of such provision be affected thereby in any other jurisdiction.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will substitute for any invalid, illegal or unenforceable provision a suitable and equitable provision that carries out, so far as may be valid, legal and enforceable, the intent and purpose of such invalid, illegal or unenforceable provision.

11.8 <u>Amendment</u>. This Agreement may be amended, supplemented or modified only by execution of a written instrument signed by the Purchaser and the Company.

11.9 <u>Waiver</u>. The Purchaser on behalf of itself and its Affiliates, the Company on behalf of itself and its Affiliates, may in its sole discretion (i) extend the time for the performance of any obligation or other act of any other non-Affiliated Party hereto, (ii) waive any inaccuracy in the representations and

warranties by such other non-Affiliated Party contained herein or in any document delivered pursuant hereto and (iii) waive compliance by such other non-Affiliated Party with any covenant or condition contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the Party or Parties to be bound thereby. Notwithstanding the foregoing, no failure or delay by a Party in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise of any other right hereunder.

11.10   Entire Agreement. This Agreement and the documents or instruments referred to herein, including any exhibits and schedules attached hereto, which exhibits and schedules are incorporated herein by reference, together with the Ancillary Documents, embody the entire agreement and understanding of the Parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, representations, warranties, covenants or undertakings, other than those expressly set forth or referred to herein or the documents or instruments referred to herein, which collectively supersede all prior agreements and the understandings among the Parties with respect to the subject matter contained herein.

11.11   Counterparts. This Agreement may be executed and delivered (including by facsimile or other electronic transmission) in one or more counterparts, and by the different Parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

11.12   Power of Attorney. The Sellers, each and individually, irrevocably and severally appoint Henrik Rouf to be their attorney in fact and to take any action which the Sellers are obliged to take under this Agreement. The Sellers hereby ratify and confirm whatever their attorney in fact does or purports to do pursuant to its appointment under this Section 11.12.

## ARTICLE XII
## DEFINITIONS

12.1 Certain Definitions. For purpose of this Agreement, the following capitalized terms have the following meanings:

"***Accounting Principles***" means in accordance with GAAP as in effect at the date of the financial statement to which it refers or if there is no such financial statement, then as of the Closing Date, using and applying the same accounting principles, practices, procedures, policies and methods (with consistent classifications, judgments, elections, inclusions, exclusions and valuation and estimation methodologies) used and applied by the Company in the preparation of the latest audited Financial Statements. In any event, the Accounting Principles (i) shall not include any purchase accounting or other adjustment arising out of the consummation of the transactions contemplated by this Agreement, (ii) shall be based on facts and circumstances as they exist at or prior to the Closing and shall exclude the effect of any act, decision or event occurring after the Closing and (iii) shall follow the defined terms contained in this Agreement.

"***Action***" means any notice of noncompliance or violation, or any claim, demand, charge, action, suit, litigation, audit, settlement, complaint, stipulation, assessment or arbitration, or any request (including any request for information), inquiry, hearing, proceeding or investigation, by or before any Governmental Authority.

"***Affiliate***" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person.

"***Ancillary Documents***" means each agreement, instrument or document attached hereto as an Exhibit, and the other agreements, certificates and instruments to be executed or delivered by any of the Parties hereto in connection with or pursuant to this Agreement.

"***Assignment and Assumption Agreement***" means the (i) Assignment and Assumption Agreement relating to the Company between Purchaser and the Sellers substantially in the form of <u>Exhibit A</u>".

"***Benefit Plans***" of any Person means any and all deferred compensation, executive compensation, incentive compensation, equity purchase or other equity-based compensation plan, employment or consulting, severance or termination pay, holiday, vacation or other bonus plan or practice, hospitalization or other medical, life or other insurance, supplemental unemployment benefits, profit sharing, pension, or retirement plan, program, agreement, commitment or arrangement, and each other employee benefit plan, program, agreement or arrangement, including each "employee benefit plan" as such term is defined under Section 3(3) of ERISA, maintained or contributed to or required to be contributed to by a Person for the benefit of any employee or terminated employee of such Person, or with respect to which such Person has any Liability, whether direct or indirect, actual or contingent, whether formal or informal, and whether legally binding or not.

"***Business Day***" means any day other than a Saturday, Sunday or a legal holiday on which commercial banking institutions in New York, New York are authorized to close for business.

"***Code***" means the Internal Revenue Code of 1986, as amended, and any successor statute thereto, as amended.  Reference to a specific section of the Code shall include such section and any valid treasury regulation promulgated thereunder.

"***Company Charter***" means the Operating Agreement of the Company, as amended.

"***Confidential Information***" means all confidential or proprietary documents and information concerning the either Party or any of its Representatives; <u>provided</u>, <u>however</u>, that the Confidential Information shall not include any information which, (i) at the time of disclosure by the Company or its respective Representatives, is generally available publicly and was not disclosed in breach of this Agreement or (ii) at the time of the disclosure by the Purchaser or its Representatives to the Company or its Representatives, was previously known by such receiving party without violation of Law or any confidentiality obligation by the Person receiving such Purchaser Confidential Information.  For the avoidance of doubt, from and after the Closing, Purchaser Confidential Information will include the confidential or

"***Consent***" means any consent, approval, waiver, authorization or Permit of, or notice to or declaration or filing with any Governmental Authority or any other Person.

"***Contracts***" means all contracts, agreements, binding arrangements, bonds, notes, indentures, mortgages, debt instruments, purchase order, licenses (and all other contracts, agreements or binding arrangements concerning Intellectual Property), franchises, leases and other instruments or obligations of any kind, written or oral (including any amendments and other modifications thereto).

"***Control***" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, or otherwise.  "Controlled", "Controlling" and "under common Control with" have correlative meanings.  Without limiting the foregoing a Person (the "***Controlled Person***") shall be deemed Controlled by (a) any other Person (the "***10% Owner***") (i) owning beneficially, as meant in Rule

13d-3 under the Exchange Act, securities entitling such Person to cast ten percent (10%) or more of the votes for election of directors or equivalent governing authority of the Controlled Person or (ii) entitled to be allocated or receive ten percent (10%) or more of the profits, losses, or distributions of the Controlled Person; (b) an officer, director, general partner, partner (other than a limited partner), manager, or member (other than a member having no management authority that is not a 10% Owner) of the Controlled Person; or (c) a spouse, parent, lineal descendant, sibling, aunt, uncle, niece, nephew, mother-in-law, father-in-law, sister-in-law, or brother-in-law of an Affiliate of the Controlled Person or a trust for the benefit of an Affiliate of the Controlled Person or of which an Affiliate of the Controlled Person is a trustee.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***FINRA***" means the Financial Industry Regulatory Authority, Inc.

"***Fraud Claim***" means any claim based in whole or in part upon fraud, willful misconduct or intentional misrepresentation.

"***GAAP***" means generally accepted accounting principles as in effect in the United States of America.

"***Governmental Authority***" means any federal, state, local, foreign or other governmental, quasi-governmental or administrative body, instrumentality, department or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"***Indebtedness***" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money (including the outstanding principal and accrued but unpaid interest), (b) obligations for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of business), (c) any other indebtedness of such Person that is evidenced by a note, bond, debenture, credit agreement or similar instrument, (d) all obligations of such Person under leases that should be classified as capital leases in accordance with GAAP, (e) all obligations of such Person for the reimbursement of any obligor on any line or letter of credit, banker's acceptance, guarantee or similar credit transaction, in each case, that has been drawn or claimed against, (f) all obligations of such Person in respect of acceptances issued or created, (g) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (h) all obligations secured by an Lien on any property of such Person, (i) any premiums, prepayment fees or other penalties, fees, costs or expenses associated with payment of any Indebtedness of such Person and (j) all obligation described in clauses (a) through (i) above of any other Person which is directly or indirectly guaranteed by such Person or which such Person has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a creditor against loss.

"***Intellectual Property***" means all of the following as they exist in any jurisdiction throughout the world: patents, trademarks, copyrights, trade secrets, internet assets, software and other intellectual property, and all licenses, sublicenses and other agreements or permissions related to the preceding property.

"***IRS***" means the U.S. Internal Revenue Service (or any successor Governmental Authority).

"**Knowledge**" means, with respect to (i) the Company, the actual knowledge of the executive officers or directors of the Company, after due inquiry or (ii) any other Party, the actual knowledge of its directors and executive officers, after due inquiry.

"**Law**" means any federal, state, local, municipal, foreign or other law, statute, legislation, principle of common law, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, directive, requirement, writ, injunction, settlement, Order or Consent that is or has been issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Authority.

"**Liabilities**" means any and all liabilities, Indebtedness, Actions or obligations of any nature (whether absolute, accrued, contingent or otherwise, whether known or unknown, whether direct or indirect, whether matured or unmatured and whether due or to become due), including Tax liabilities due or to become due.

"**Lien**" means any mortgage, pledge, security interest, attachment, right of first refusal, option, proxy, voting trust, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), restriction (whether on voting, sale, transfer, disposition or otherwise), any subordination arrangement in favor of another Person, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar Law.

"**Material Adverse Effect**" means, with respect to any specified Person, any fact, event, occurrence, change or effect that has had, or would reasonably be expected to have, individually or in the aggregate, a material adverse effect upon (a) the business, assets, Liabilities, results of operations, prospects or condition (financial or otherwise) of such Person and its Subsidiaries, taken as a whole, or (b) the ability of such Person or any of its Subsidiaries on a timely  basis to consummate the transactions contemplated by this Agreement or the Ancillary Documents to which it is a party or bound or to perform its obligations hereunder or thereunder; provided, however, that for purposes of clause (a) above, any changes or effects directly or indirectly attributable to, resulting from, relating to or arising out of the following (by themselves or when aggregated with any other, changes or effects) shall not be deemed to be, constitute, or be taken into account when determining whether there has or may, would or could have occurred a Material Adverse Effect:  (i) general changes in the financial or securities markets or general economic or political conditions in the country or region in which such Person or any of its Subsidiaries do business; (ii) changes, conditions or effects that generally affect the industries in which such Person or any of its Subsidiaries principally operate; (iii) changes in GAAP or other applicable accounting principles or mandatory changes in the regulatory accounting requirements applicable to any industry in which such Person and its Subsidiaries principally operate; (iv) conditions caused by acts of God, terrorism, war (whether or not declared) or natural disaster; (v) any failure in and of itself by such Person and its Subsidiaries to meet any internal or published budgets, projections, forecasts or predictions of financial performance for any period (provided that the underlying cause of any such failure may be considered in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent not excluded by another exception herein) and (vi), with respect to the Purchaser, the consummation and effects of the Redemption; provided further, however, that any event, occurrence, fact, condition, or change referred to in clauses (i) - (iv) immediately above shall be taken into account in determining whether a Material Adverse Effect has occurred or could reasonably be expected to occur to the extent that such event, occurrence, fact, condition, or change has a disproportionate effect on such Person or any of its Subsidiaries compared to other participants in the industries in which such Person or any of its Subsidiaries primarily conducts its businesses.

"*Order*" means any order, decree, ruling, judgment, injunction, writ, determination, binding decision, verdict, judicial award or other action that is or has been made, entered, rendered, or otherwise put into effect by or under the authority of any Governmental Authority.

"*Organizational Documents*" means, with respect to any Person that is an entity, its certificate of incorporation or formation, bylaws, operating agreement or similar organizational documents, in each case, as amended.

"*PCAOB*" means the U.S. Public Company Accounting Oversight Board (or any successor thereto).

"*Permits*" means all federal, state, local or foreign or other third-party permits, grants, easements, consents, approvals, authorizations, exemptions, licenses, franchises, concessions, ratifications, permissions, clearances, confirmations, endorsements, waivers, certifications, designations, ratings, registrations, qualifications or orders of any Governmental Authority or any other Person.

"*Permitted Liens*" means (a) Liens for Taxes or assessments and similar governmental charges or levies, which either are (i) not delinquent or (ii) being contested in good faith and by appropriate proceedings, and adequate reserves have been established with respect thereto, (b) other Liens imposed by operation of Law arising in the ordinary course of business for amounts which are not due and payable and as would not in the aggregate materially adversely affect the value of, or materially adversely interfere with the use of, the property subject thereto, (c) Liens incurred or deposits made in the ordinary course of business in connection with social security, (d) Liens on goods in transit incurred pursuant to documentary letters of credit, in each case arising in the ordinary course of business, or (v) Liens arising under this Agreement or any Ancillary Document.

"*Person*" means an individual, corporation, partnership (including a general partnership, limited partnership or limited liability partnership), limited liability company, association, trust or other entity or organization, including a government, domestic or foreign, or political subdivision thereof, or an agency or instrumentality thereof.

"*Personal Property*" means any machinery, equipment, tools, vehicles, furniture, leasehold improvements, office equipment, plant, parts and other tangible personal property.

"*Purchaser Charter*" means the certificate of incorporation of the Purchaser, as amended and effective under Chapter 78 of the Nevada Revised Statutes

"*Purchaser Common Stock*" means the shares of common stock, par value $0.001 per share, of the Purchaser.

"*Representatives*" means, as to any Person, such Person's Affiliates and the respective managers, directors, officers, employees, independent contractors, consultants, advisors (including financial advisors, counsel and accountants), agents and other legal representatives of such Person or its Affiliates.

"*SEC*" means the Securities and Exchange Commission (or any successor Governmental Authority).

"*Securities Act*" means the Securities Act of 1933, as amended.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, association or other business entity, a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.  For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a partnership, association or other business entity if such Person or Persons will be allocated a majority of partnership, association or other business entity gains or losses or will be or control the managing director, managing member, general partner or other managing Person of such partnership, association or other business entity.  A Subsidiary of a Person will also include any variable interest entity which is consolidated with such Person under applicable accounting rules.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Taxes or the administration of any Laws or administrative requirements relating to any Taxes.

"**Taxes**" means (a) all direct or indirect federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, value-added, ad valorem, transfer, franchise, profits, license, lease, service, service use, withholding, payroll, employment, social security and related contributions due in relation to the payment of compensation to employees, excise, severance, stamp, occupation, premium, property, windfall profits, alternative minimum, estimated, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts with respect thereto, (b) any Liability for payment of amounts described in clause (a) whether as a result of being a member of an affiliated, consolidated, combined or unitary group for any period or otherwise through operation of law and (c) any Liability for the payment of amounts described in clauses (a) or (b) as a result of any tax sharing, tax group, tax indemnity or tax allocation agreement with, or any other express or implied agreement to indemnify, any other Person.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____
Bennett J. Yankowitz, President and Sole
Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By:
Name: Gert Funk
Title: President

*The Sellers*:

Gert Funk

Joseph Page

**PacificWave Partners Limited**

By: _____
Name: Henrik Rouf
Title: Managing Director

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____

Bennett J. Yankowitz, President and Sole Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By: _____

Name: Gert Funk
Title: President

*The Sellers*:

_____

Gert Funk

_____

Joseph Page

**PacificWave Partners Limited**

By: _____

Name: Henrik Rouf
Title: Managing Director

**PacificWave Partners UK Ltd.**

By: _____

Name: Henrik Oerbekker
Title:  Managing Director

**Saxton Capital Ltd.**

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____

    Bennett J. Yankowitz, President and Sole
    Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By: _____

    Name: Gert Funk
    Title: President

*The Sellers*:


_____

Gert Funk


_____

Joseph Page

**PacificWave Partners Limited**

By: _____

    Name: Henrik Rouf
    Title: Managing Director

**PacificWave Partners UK Ltd.**

By: _____

    Name: Henrik Oerbekker
    Title:  Managing Director

**Saxton Capital Ltd.**

By: _____

    Name: John Moerk
    Title: Director

IN WITNESS WHEREOF, each Party hereto has caused this Agreement to be signed and delivered as of the date first written above.

*The Purchaser:*

**B4MC GOLD MINES, INC.**

By: _____

    Bennett J. Yankowitz, President and Sole Director

*The Company:*

**ROCKETFUEL BLOCKCHAIN COMPANY**

By: _____

    Name: Gert Funk
    Title: President

*The Sellers*:

_____

Gert Funk

_____

Joseph Page

**PacificWave Partners Limited**

By: _____

    Name: Henrik Rouf
    Title: Managing Director

**PacificWave Partners UK Ltd.**

By: _____

    Name: Henrik Oerbekker
    Title:  Managing Director

**Saxton Capital Ltd.**

By: _____

    Name: John Moerk
    Title: Director